# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-2889

_____

| | | |
|---|---|---|
| Victoria Johnson, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| James Steven Carroll, Badge 1005; | * | Appeal from the United States |
| Chad Chul Hofius, Badge 3055; | * | District Court for the |
| Mathew Alan Kipke, Badge 3717; | * | District of Minnesota. |
| Paul John Schweiger, Badge 6410, | * | |
| in their individual and official | * | |
| capacities as Minneapolis Police | * | |
| Officers; and The City of Minneapolis, | * | |
| a government entity and political | * | |
| subdivision of the State of Minnesota, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: March 16, 2011
Filed: October 7, 2011

_____

Before WOLLMAN, MURPHY, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Victoria Johnson filed suit against four Minneapolis police officers and the City of Minneapolis (City). Her claim against the officers under 42 U.S.C. § 1983 alleged that they used excessive, unreasonable force against her, in violation of the

Fourth and Fourteenth Amendments. Her claim against the City alleged a violation of the Minnesota Government Data Practices Act (DPA). Her state-law claim alleged that the officers and the City were liable for battery and negligence. The district court granted summary judgment in favor of the officers and the City on all claims, holding that the officers had not violated Johnson's constitutional right, that Johnson failed to allege any damages for her DPA claim, that the battery claims against the officers were untimely, and that the City and the officers were entitled to official immunity from her state law claims.

Johnson appeals. We affirm the dismissal of the battery claims against the officers and the dismissal of the § 1983 claim against Carroll. We vacate the remainder of the judgment and remand for further proceedings.

## I. Background

This case arose from an incident that occurred at approximately 6:30 p.m. on December 20, 2006, between four Minneapolis police officers, Johnson, and her nephew, Joseph McClennon. At that time, Johnson, age 39, was living with her three children, her niece, her nephew McClennon, and another nephew.

As might be expected, the parties have significantly different accounts of what occurred. According to Johnson, as she was preparing to depart for her Bible study group that evening, she was told by her son Blake that "Mom, the police are outside harassing Joseph." Johnson left the house and stood in her front yard, where she witnessed Officer John Schweiger question McClennon, pat him down, remove items from his pockets, and place him in the back of Schweiger's squad car. A second squad car arrived, occupied by Officers Chad Hofius and Mathew Kipke. Johnson asked Hofius and Kipke about what was happening, to which one of the officers replied, "you are ignorant," and the other said that Johnson was acting "childish."

Schweiger released McClennon from the squad car and threw an earlier-prepared drug paraphernalia citation at him, which McClennon bent down to pick up.

As McClennon began walking towards Johnson and her home, she told him to return to Schweiger's car to "get his stuff" that had been left on the hood. Johnson observed McClennon return to the car, where Schweiger swung at McClennon with a flashlight. When McClennon pushed the flashlight away, Schweiger grabbed him, pulled him into the street towards the second squad car, and attempted to take him to the ground. Although McClennon was not struggling, Hofius and Kipke approached to assist with the arrest. Johnson ran past the officers and jumped onto McClennon, bear-hugging him face-to-face, telling him to get to the ground, and trying to protect him from the officers in a non-resistant manner. Without first ordering Johnson to remove herself from McClennon, either Hofius or Kipke pulled her away from McClennon and threw her to the ground, "very hard, very forcefully." Johnson arose and again bear-hugged McClennon, this time from behind. The same officer pulled Johnson off McClennon and again threw her to the ground, "very hard," "very much" harder than the first time, injuring her left knee. An officer then tased McClennon, who fell to the ground. Johnson crawled over to McClennon as he lay there still shaking from being tased and again blanketed him with her body. With no warning or request that Johnson remove herself, Schweiger then maced her in the face, whereupon she "backed up off" McClennon so that the officers could remove the taser prongs from his body. Thereafter, Johnson crawled to the curb, where she was able to arise only by grasping a tree for support. A group of bystanders, including her two sons, stood there on the sidewalk. According to McClennon, there were "a lot of people," "a bunch of both, men and women," asking questions of the officers and loudly protesting what was happening to him and Johnson. Schweiger arrested McClennon and placed him in the back of the Schweiger's squad car. Hofius arrested Johnson, handcuffed her, and took her to jail.

At the jail, Johnson was provided with a wheelchair and attended to by a nurse. After being held for 72 hours, Johnson was released. She was initially charged with obstructing legal process but was never prosecuted. She visited a clinic to receive pain medication for her knee injury, which was later diagnosed as an anterior cruciate ligament (ACL) tear and small effusion with no other meniscal damage. Johnson underwent surgery on the knee in May 2007, following which she underwent ten weeks of physical therapy.

According to Schweiger's account of the incident, as he and Officer James Carroll, a passenger in Schweiger's squad car, drove near Johnson's home they noticed McClennon standing next to a parked car. When McClennon saw the squad car he turned and walked away, refusing to answer Schweiger's question regarding what he was doing and unwilling to take his hands out of his pockets despite Schweiger's repeated requests that he do so. Schweiger escorted McClennon to the squad car, performed a pat-down, found a pipe that he thought smelled of marijuana, and placed McClennon in the back seat of the car. After Schweiger issued McClennon a citation for possession of drug paraphernalia, he was released and brushed against Schweiger. When McClennon realized that he had left his belongings on the hood of the squad car, he returned to the car and began swinging at Schweiger. Schweiger, Hofius, and Kipke brought McClennon under control after taking him to the ground and tasing him. Johnson ran past the officers and jumped onto McClennon's back to prevent the officers from arresting him as he lay on the ground. She failed to follow verbal orders to move, resulting in her being maced and physically removed from McClennon. Both were arrested and taken to jail. During the incident, Carroll was keeping a crowd of anti-police bystanders, which had grown from eight to twenty persons, away from the scene by ordering them to stay back and by threatening to use his mace. Schweiger described the crowd as "quite large and very hostile" and that it "became even more belligerent," yelling at the officers "F**k the police" and "Get the f**k out of here."

In March 2007, Johnson sent notice of her claim to the City, pursuant to Minnesota Statute § 466.05. In March 2008, she requested that the City provide her with access to the police records from the December 20, 2006, incident pursuant to the DPA. In April 2008, the City provided her with a copy of the public police report. Johnson made another request on November 14, 2008. She filed this suit on December 19, 2008, with service on the City. The City responded to her second data request on February 10, 2009. Schweiger, Carroll, and Kipke were served on February 25, 2009, and Hofius on March 25, 2009. The City and the officers moved for summary judgment on all claims, asserting qualified immunity on Johnson's § 1983 constitutional claim, a lack of damages on her DPA claim, and statute of limitations and official immunity defenses on her state-law claims.

## II. Discussion

Johnson asserts that the district court erred in finding that the officers had not violated her clearly established constitutional right to be free from excessive, unreasonable force. She contends that the district court erred by failing to determine whether she was entitled to costs and disbursements on her DPA claim. Finally, she asserts that because the officers acted maliciously or willfully in violating state law, they and the City were not entitled to official immunity.

We review *de novo* the district court's grant of summary judgment. Hayek v. City of St. Paul, 488 F.3d 1049, 1054 (8th Cir. 2007). "Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." Id.; Fed. R. Civ. P. 56.

-5-

## A. Section 1983 Claim

Section 1983 provides redress against any "person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" Mitchum v. Foster, 407 U.S. 225, 242 (1972).

"Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009). "Qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. at 496. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

1.

Our initial inquiry is whether the facts alleged support Johnson's contention that the officers violated her Fourth Amendment right to be free from excessive force during the course of her arrest. "Claims of excessive force are evaluated under the reasonableness standard of the Fourth Amendment." McKenney v. Harrison, 635 F.3d 354, 359 (8th Cir. 2011). "Fourth Amendment jurisprudence has long

recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Brown, 574 F.3d at 496. "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." Id.

"We determine whether a use of force was reasonable by balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" McKenney, 635 F.3d at 359 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). In reviewing whether the use of force was reasonable, "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." Graham, 490 U.S. at 396 (internal citation omitted). In circumstances that are "tense, uncertain, and rapidly evolving," whether the use of force was reasonable must embody an allowance for the fact that police officers are often forced to make split-second judgments about the amount of force that is necessary in a particular situation. Graham, 490 U.S. at 396-97.

As we recently observed, the degree of injury suffered in an excessive-force case "is certainly relevant insofar as it tends to show the amount and type of force used." Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011); Rohrbough v. Hall, 586 F.3d 582, 586 (8th Cir. 2009) ("A court may also evaluate the extent of the [plaintiff's] injuries.").

The district court appears to have credited the officers' characterization of the crowd and determined that the circumstances were "tense, uncertain, and rapidly evolving," thus justifying the officers' use of force against Johnson. Graham, 490 U.S. at 397. The district found that "plaintiff's repeated interference with the arrest endangered the Officers and herself." D. Ct. Order of July 29, 2010, at 9. It found that her injuries "stem[med] from her repeated attempts to interfere with the arrest," and that the officers' actions were objectively reasonable as a matter of law because Johnson "voluntarily interfered with the arrest, despite repeated efforts to prevent her from doing so." Id. The district court concluded that "[r]easonable officers would have believed her actions could have escalated their encounter with the crowd and McClennon." Id. The officers' descriptions of the bystanders and the circumstances surrounding the incident are conflicting, however, and it is unclear whether any increase in the number of bystanders was in response to Schweiger's conduct towards McClennon or the officers' conduct towards Johnson. It is disputed whether the incident was initially escalated by Schweiger's striking McClennon with a flashlight or whether McClennon took multiple swings at Schweiger and then continued to actively resist the officers.[1]

Johnson posed at most a minimal safety threat to the officers and was not actively resisting arrest or attempting to flee. The officers knew from their patdown that McClennon was unarmed. While there is no dispute that Johnson's attempts to

---

[1] Johnson contends that there is clearly established law recognizing her right to intervene in the defense of another from excessive, unreasonable police force. Appellant's Br. at 78. She did not state such a claim in her complaint, however, and thus we do not address whether such a right exists or was clearly established at the time of the incident.

Johnson also alleges violations of McClennon's Fourth Amendment right to be free from arrest without probable cause, Appellant's Br. at 60, and from excessive force during the course of his arrest, id. at 71. We agree with the district court that Johnson has no standing to pursue McClennon's claims, which he has alleged in his own suit against these officers and the City.

protect her nephew interfered with the officers' attempt to arrest McClennon, there is a dispute regarding the number of times she did so. According to Johnson, the officers were easily able to twice remove her by pushing her to the ground, and that she "backed up off" McClennon after they sprayed mace into her face. When viewed in the light most favorable to her, the record supports Johnson's claim that she was attempting to protect her nephew's physical well being by interjecting her body between him and the officers. There is no evidence that Johnson actively pushed the officers away from McClennon, threatened them, or took any other action against them. Johnson asserts that the officers gave her no verbal commands to remove herself from McClennon. J.A. at A-II-56 ("[The officers] weren't say[ing] anything, but [I could] hear everything. But no one was saying anything."); id. at A-II-56 to 57 ("Q. Did [the officer] say anything to you before he sprayed you? A. No, he did not."). Johnson claims that they pushed her to the ground "very purposeful[ly] and meant to hurt [her]" and that it resulted in her knee being injured. Id. at A-II-65. Johnson could not be guilty of failing to obey the officers' verbal commands because, according to her, there were none given.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Johnson, we cannot say that the officers' use of force was objectively reasonable as a matter of law. Johnson's attempts to interfere with McClennon's arrest did not amount to a severe or violent offense, as demonstrated by her arrest on a charge of obstructing legal process, a misdemeanor punishable by imprisonment for not more than 90 days, a fine of not more than $1,000, or both. Minn. Stat. § 609.50, subdiv. 2(3). Thus, we conclude that there are genuine issues of material fact regarding whether the officers used excessive force against Johnson. While a jury may credit the officers' assertions and disbelieve Johnson at trial, "it is not our function to remove the credibility assessment from the jury." Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002).

2.

Because the district court found that no violation of a constitutional right had occurred, it was unnecessary for it to determine whether any such right was clearly established, which is a legal question for us to determine. Brown, 574 F.3d at 499. This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Pearson, 555 U.S. at 244. "A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Brown, 574 F.3d at 499 (internal quotation marks omitted).

The Fourth Amendment's prohibition against unreasonable searches and seizures clearly established the right to be free from excessive force in the context of an arrest. Id. "Moreover, it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." Id.; see also Graham, 490 U.S. at 396. "Although earlier cases need not involve fundamentally or materially similar facts, the earlier cases must give officials fair warning that their alleged treatment of the plaintiff was unconstitutional." Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002) (internal quotation marks omitted). At the time of this incident, the law was sufficiently clear to inform a reasonable officer that it was unlawful to throw to the ground and mace a nonviolent, suspected misdemeanant who was not fleeing or herself resisting arrest, who posed little or no threat to anyone's safety, who never received verbal commands to remove herself, and whose only action was to engage in a protective maneuver.

The district court did not examine Johnson's claims against each officer individually. Johnson has no recollection of Carroll being present during the incident

-10-

and agreed that he "did not do anything to [her]." Carroll stated that his attention was focused on controlling the growing crowd, that he did not see any force used against Johnson by the officers, and that he assisted Hofius only with handcuffing Johnson. Because Johnson admits that Carroll did not use excessive force against her, we affirm the district court's dismissal of the § 1983 claim against him.[2]

## B. Minnesota Government Data Practices Act

The DPA "establishes a presumption that government data are public and are accessible by the public for both inspection and copying" unless federal or state law provides that the data are not public. Minn. Stat. § 13.01, subdiv. 3. Minnesota Statute § 13.08 provides civil remedies for violations of the DPA, including an action for damages under subdivision 1 and an action to compel compliance under subdivision 4. Under subdivision 1, a person who suffers any damage as a result of a violation of the DPA may bring "an action against the responsible authority or government entity to cover any damages sustained, plus costs and reasonable attorney fees." Subdivision 4 provides that "any aggrieved person seeking to enforce the person's rights under this chapter or obtain access to data may bring an action in district court to compel compliance with this chapter and may recover costs and disbursements, including reasonable attorney's fees, as determined by the court." See Wiegel v. City of St. Paul, 639 N.W.2d 378, 384-86 (Minn. 2002).

We agree with the district court's conclusion that because Johnson did not allege any damages, she failed to state a claim under subdivision 1. The district court failed, however, to consider whether Johnson could recover her costs and disbursements in her December 19, 2008, action to compel compliance under

---

[2]Johnson contends that "Carroll, the least culpable is still culpable under clearly established law for failing to intervene." Appellant's Br. at 75. Having failed to state such a claim in her complaint, we do not address whether such a right exists or was clearly established at the time of the incident.

-11-

subdivision 4. We disagree with the government's contention that this issue is moot, and thus we remand for a ruling on whether Johnson is entitled to any costs or disbursements under that section of the statute.

## C. Common Law Battery and Negligence Claims

### 1. Battery Claims Against Individual Officers

Under Minnesota law, a party must commence an action for battery within two years. Minn. Stat. § 541.07. A civil action is commenced against the defendant when the summons is served upon that defendant. Minn. R. Civ. P. 3.01. If state law requires service to commence an action, state law, and not Federal Rule of Civil Procedure 3, governs for the purposes of the state statute of limitations. Anderson v. Unisys Corp., 47 F.3d 302, 309 (8th Cir. 1995).

The district court dismissed Johnson's common law battery claims against the officers as untimely because the two-year statute of limitations period expired on December 19, 2008, and the officers were not served until February and March 2009. Johnson contends that "service is timely and proper for each appealed claim," but she has failed to explain how her battery claims against the officers were commenced within the statute of limitations, and we therefore agree that the district court properly dismissed those claims.

### 2. Official Immunity

The district court also held that the officers were entitled to official immunity for all state law claims and the City was thus not liable. We review *de novo* the district court's ruling on the question of immunity. See Wiederholt v. City of Minneapolis, 581 N.W.2d 312, 315 (Minn. 1998). "[U]nder Minnesota law a public official is entitled to official immunity from state law claims when that official is

-12-

charged by law with duties that require the exercise of judgment or discretion." Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990). Police officers are generally classified as "discretionary officers" and are entitled to official immunity. Id. at 42. An exception to that immunity "exists if the officer acted maliciously or willfully." Id. "Malice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited." Kelly v. City of Minneapolis, 598 N.W.2d 657, 663 (Minn. 1999). "[V]icarious official immunity protects the government entity from suit based on the official immunity of its employee," Wiederholt, 581 N.W.2d at 316, and thus generally the claim against the government entity "has been dismissed without any explanation" once an employee is determined to be protected by official immunity. Pletan v. Gaines, 494 N.W.2d 38, 42 (Minn. 1992).

We conclude that Johnson presented sufficient evidence to preclude summary judgment on the basis of official immunity on the alleged state tort claims. As set forth above, there is a factual dispute regarding whether the officers used excessive force during the arrest. Accepting Johnson's account as true, a jury could find that the officers are not entitled to official immunity because they willfully violated her right to be free from excessive force. See Brown, 574 F.3d at 500-01.

## III. Conclusion

We affirm the dismissal of the battery claims against the officers and the dismissal of the § 1983 claim against Carroll. We vacate the remainder of the judgment and remand the case to the district court for further proceedings.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I concur in the portions of the Court's opinion affirming the grant of summary judgment with respect to the § 1983 claim against Carroll and the dismissal of the

-13-

battery claims, and vacating and remanding with respect to the Minnesota Data Practices Act claim. However, I respectfully dissent from the portion of the Court's opinion vacating the grant of summary judgment with respect to the § 1983 claim against the remaining officers and the remaining state-law claims. I would hold that, taking Johnson's account of the officers' actions as true, the officers used reasonable force at each step of their graduated response to her repeated interference with their arrest of McClennon.

According to Johnson herself, Officer Schweiger had grabbed McClennon and was attempting to take him to the ground when Johnson jumped onto McClennon for the first time, "bear-hugging" him. While the Court repeatedly faults the officers for not pausing in the midst of their physical encounter with the arrestee to request that Johnson remove herself, a "reasonable officer on the scene," *Graham v. Connor*, 490 U.S. 386, 396 (1989), might well conclude that such a verbal warning would be futile in light of Johnson's manic action.[3] Moreover, a reasonable officer coping with Johnson's intrusion into the arrest scene "in circumstances that [we]re tense, uncertain, and rapidly evolving," *id.* at 397, certainly could conclude that other bystanders might decide to follow suit if Johnson's actions were not deterred quickly and convincingly.[4] It was, therefore, not unreasonable for the officers to employ

---

[3]The officers claim that they verbally instructed Johnson to remove herself, but we construe the facts in the light most favorable to Johnson in determining whether a constitutional right was violated. *See Dodd v. Jones*, 623 F.3d 563, 566 (8th Cir. 2010).

[4]The Court attempts to minimize the tense and uncertain nature of the circumstances in which the officers acted, noting that descriptions of the bystanders are "conflicting" and that the number of bystanders may have increased only after the officers' use of force against Johnson. *Ante* at 8. Even construing the record in the light most favorable to Johnson, however, those facts are sufficient to establish the potential for escalating crowd resistance when Johnson initially intervened. McClennon testified that just before Johnson first bear-hugged him, "there were lots of people" outside watching the incident and questioning the officers' actions.

some degree of force to remove Johnson from the midst of their struggle with McClennon.

The degree of force used to remove Johnson from McClennon the first time was not excessive. There is no evidence that Johnson was subjected to any type of force other than what would be necessary to disengage her bear-hug hold and separate her from the arrestee. To be sure, pulling Johnson away from McClennon with sufficient force that she went to the ground may seem "unnecessary in the peace of a judge's chambers," but it is not unreasonable in the context of a split-second judgment by a police officer on the scene. *Id.* at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). This conclusion is supported by the fact that Johnson sustained no injury during that first removal. *See Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) ("The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used." ).

When Johnson immediately "rushed back over," as she described it, and bear-hugged McClennon again, the officers had little choice but to physically remove her

Officer Schweiger testified to the presence of "about eight" adults, Officer Carroll to "between six and eight guys," and Officer Kipke to "people all over the place yelling and screaming," all at the point in time when Schweiger attempted to take McClennon to the ground, just prior to Johnson's initial interference.

Johnson presented no contrary evidence regarding the state of the crowd at the time of her initial interference. Although she stated at one point in her deposition that "[t]here was no one outside then but me," it was in response to a question about "the people outside involved in this incident, so we were talking about the three police officers and your son and your niece." Johnson's answers in context refer to whether her own children and niece were outside, not to the crowd in general. Therefore, even construing the record in the light most favorable to Johnson, at minimum six people were observing the struggle with McClennon when Johnson intervened. A reasonable officer could conclude that those six or more people were no more sympathetic than Johnson was to the officers' attempt to subdue McClennon.

-15-

for a second time.   While Johnson asserts that she was pulled apart from McClennon and thrown down "very much" harder than the first time, her quick return to the fray would have demonstrated to a reasonable officer that the initial degree of force had not been sufficient to deter her, or potentially others, from interfering with McClennon's arrest.  As a result, it was reasonable for the officers to use increased force to separate her from the arrestee for the second time. *See Darrah v. City of Oak Park*, 255 F.3d 301, 304, 307 (6th Cir. 2001) (holding, where the plaintiff twice grabbed the ankle of an officer attempting to arrest another, that a blow to the plaintiff's mouth necessitating stitches was a reasonable use of force after the officer's "first attempt at shaking her loose was only temporarily effective").

Unfortunately, the second physical removal of Johnson resulted in damage to the anterior cruciate ligament in her left knee.  Nevertheless, "[t]he degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted." *Chambers*, 641 F.3d at 906.  That rule is particularly applicable in this case because Johnson's knee injury is not of a type that correlates well with the strength of the force applied.[5]  Notably, Johnson did not describe any concomitant  results that would correlate more closely with hitting the ground with excessive force, such as abrasions, contusions, or temporarily being

_____

[5]This conclusion is confirmed by medical research. *See, e.g.*, Chris J. Hass et al., *Knee Biomechanics during Landings: Comparison of Pre- and Postpubescent Females*, 37 Med. & Sci. Sports & Exercise 100, 104-105 (2005) (finding that an anterior cruciate ligament tear correlates with landing on one's foot while having a stiff, straight leg, rather than with force); David Koon & Frank Bassett, *Anterior Cruciate Ligament Rupture*, 97 S. Med. J. 755 (2004) ("Most ACL tears occur by a *low-energy*, noncontact mechanism involving a sudden deceleration with a rotational maneuver, such as cutting." (emphasis added)); Letha Y. Griffin et al., *Noncontact Anterior Cruciate Ligament Injuries: Risk Factors and Prevention Strategies*, 8 J. Am. Acad. Orthop. Surg. 141, 142 (2000) (reporting that seventy percent of ACL injuries result from activities such as awkward landings and decelerating while pivoting).

unable to catch her breath.  In a broader sense, she does not assert that she was struck, kicked, had her arm bent behind her back, or was subjected to any other type of force inconsistent with a simple attempt to end her physical interference with the arrestee. Instead, the record shows that the officers took only the physical action necessary to disengage her bear-hug hold and deposit her at a safe distance from McClennon, whom the officers were attempting to tase.[6]  In short, while Johnson's injury was a traumatic and undeserved result, a reasonable degree of force needed to separate Johnson from the arrestee does not become unreasonable merely because her knee was twisted.

Finally, when Johnson proved the officers' first two efforts futile by returning for the third time to blanket McClennon with her body, it was reasonable for the officers to resort to a more potent level of force to remove her and deter further interference.  Rather than wait for her or another bystander to interfere for a fourth time, it was reasonable for the officers to use mace to ensure compliance.  *See Reed v. City of St. Charles*, 561 F.3d 788, 790-91 (8th Cir. 2009) (affirming grant of summary judgment based on qualified immunity where officers sprayed mace in an arrestee's face after his repeated refusal to cooperate with the officers).

---

[6]The Court emphasizes that "Johnson posed at most a minimal safety threat to the officers and was not actively resisting arrest or attempting to flee." *Ante* at 8. Presumably this is an attempt to invoke the list in *Graham* of circumstances relevant to the reasonableness of the force applied.  *See* 490 U.S. at 396 ("[P]roper application [of the reasonableness test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.").  However, *Graham* cites those particular circumstances as illustrative examples, not an exhaustive list.  Here, Johnson certainly was "actively resisting arrest," albeit not her own, and continued to do so three times despite the officers' graduated efforts to gain control of the situation.  Although actively resisting another's arrest was not specifically listed in *Graham*, this appears to be precisely the sort of circumstance that *Graham* envisioned as justifying the use of a greater level of force.

-17-

Because the officers used only a reasonable amount of force each time Johnson physically interfered with the arrest of McClennon, I would hold that Johnson fails to allege a violation of her constitutional right to be free from excessive force. The same analysis demonstrates that, under an objective inquiry, the officers' actions were legally reasonable, entitling them to official immunity from Johnson's remaining state-law claims as well. *See State ex rel. Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994). Accordingly, I respectfully dissent from the portion of the Court's opinion and judgment vacating the grant of summary judgment with respect to the § 1983 claim and the remaining state-law claims.

——————————————————