# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No.11-2108

_____

Justin Shekleton,

      Plaintiff-Appellee,

      v.

Ryan Eichenberger, Individually and
in his Official Capacity as a Law
Enforcement Officer for Chickasaw
County Sheriff's Department,

      Defendant-Appellant

Chickasaw County, Iowa,
      Defendant.

Appeal from the United States
District Court for the
Northern District of Iowa.

_____

Submitted: January 11, 2012
Filed: May 3, 2012

_____

Before RILEY, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Justin Shekleton brought an action pursuant to 42 U.S.C. § 1983 against Ryan Eichenberger, individually and in his capacity as a Chickasaw County, Iowa Sheriff's Department Deputy alleging Deputy Eichenberger violated Shekleton's Fourth Amendment right to be free from excessive force by unnecessarily tasering Shekleton.

Deputy Eichenberger appeals the district court's[1] denial of his motion for summary judgment as to the section 1983 individual capacity claim, asserting that Shekleton's claim is barred by the doctrine of qualified immunity.[2]  We affirm.

I.

At approximately 11:30 p.m. on September 6, 2008, Shekleton left McShanny's Bar in New Hampton, Iowa.  Upon leaving the bar, Shekleton observed Joy and Randy Brummond, John Schoenfeld, and Pamela Rausch smoking cigarettes outside the bar.  Shekleton engaged Rausch, who was a bartender at McShanny's, in a short conversation.  Simultaneously, Deputy Eichenberger drove past McShanny's while on patrol with his window rolled down and observed Shekleton and Rausch conversing.  Although Deputy Eichenberger believed Shekleton and Rausch were arguing and that their voices were loud, Shekleton, Schoenfeld, and both Brummonds stated under oath that the conversation between Shekleton and Rausch was a friendly one.

After observing Rausch and Shekleton, Deputy Eichenberger communicated to the dispatch station that he had observed two people arguing outside McShanny's, that he believed one of the two was a bartender at McShanny's, and that he was going to investigate.  Deputy Eichenberger then turned around and drove back in the direction of McShanny's, parked, and walked to the bar.

---

[1]The Honorable Jon Stuart Scoles, United States Magistrate Judge for the Northern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

[2]In his complaint, Shekleton also asserted a section 1983 claim against the County for failure to adequately train its officers as well as state law claims against Deputy Eichenberger and the County for assault and battery.  The failure to train and "official capacity" claims were dismissed by the district court, and the state claims remain pending.  These claims are not part of this interlocutory appeal.

When Deputy Eichenberger arrived on foot at McShanny's, Shekleton was walking away from the bar and Rausch had already gone inside. Deputy Eichenberger approached Shekleton and asked him why he had been arguing with Rausch. Shekleton explained to Deputy Eichenberger that the two had not been arguing. Deputy Eichenberger asked the same question again, Shekleton again responded that there had been no argument and suggested that Deputy Eichenberger go into McShanny's and ask Rausch if the two had been arguing. At this point, two other officers—responding to Deputy Eichenberger's radio transmission—arrived on the scene. Deputy Eichenberger directed the two officers to go in the bar and ask Rausch what had occurred outside with Shekleton.

Deputy Eichenberger believed Shekleton was intoxicated and asked him to move away from the street corner. In response, Shekleton moved back towards the buildings along the street and leaned against the wall of a store adjacent to McShanny's. Deputy Eichenberger then asked Shekleton for a third time to explain why he had been arguing with Rausch. According to Deputy Eichenberger, Shekleton then became agitated, told Deputy Eichenberger he had not been arguing with Rausch, and demanded that Deputy Eichenberger "fucking apologize" to him. Shekleton agrees he asked for an apology, but denies using an obscenity. The three affiant witnesses support Shekleton's version of events.[3]

After Shekleton demanded an apology from Deputy Eichenberger, Shekleton stopped leaning against the wall, unfolded his arms, and turned toward Deputy Eichenberger. Deputy Eichenberger believed this behavior was threatening; however, Shekleton stated under oath that he did not behave aggressively towards Deputy

---

[3]In his affidavit, Schoenfeld stated if Deputy Eichenberger and Shekleton were in a heated argument, he did not notice it and did not hear Shekleton use an obscenity toward the officers. Randy Brummond stated in his affidavit that Shekleton did not "yell[] [or] scream[]" at the officer. In her affidavit, Joy Brummond stated that she did not remember Shekleton swearing or acting "belligerent" towards the officer.

Eichenberger.[4]  After Shekleton moved away from the wall, Deputy Eichenberger twice instructed Shekleton to place his hands behind his back.  Shekleton told Deputy Eichenberger both times that he was unable to place his arms behind his back.  In 1998, Shekleton suffered a head injury as a result of a hunting accident and has since suffered from left-side dystonia, a condition that causes his left arm to shake beyond his control.  Deputy Eichenberger responded "I know" after Shekleton told him he could not control his arm.  (J. Brummond Aff. ¶ 13).[5]  Additionally, Shekleton has lived in New Hampton since 1997 and is a well-known businessman in the community of approximately 3700 people; likewise, many in the small community know of his disability.

When Shekleton did not place his arms behind his back, Deputy Eichenberger attempted to handcuff him.  According to Shekleton, Deputy Eichenberger lost his grip on Shekleton as the two accidentally fell in Deputy Eichenberger's attempt to handcuff him.  According to Eichenberger, Shekleton broke away from him in an attempt to resist arrest.  At this point, the other two officers exited McShanny's and

---

[4]We note that Deputy Eichenberger devotes much of his brief to his argument that the district court improperly considered certain facts as material.  In particular, Deputy Eichenberger argues that because Shekleton admitted that Deputy Eichenberger believed Shekleton and Rausch were arguing and believed that Shekleton was behaving aggressively towards him, the testimony disputing those facts is immaterial.  However, because an officer's actions in an excessive force case are evaluated under an objective standard, Deputy Eichenberger's belief as to what was happening is irrelevant.  See Johnson v. Carroll, 658 F.3d 819, 825 (8th Cir. 2011).  Instead, what is relevant is whether a reasonable officer would have believed the facts to be as Deputy Eichenberger believed them to be and whether a reasonable officer would have determined the use of a taser was necessary under those facts.

[5]Additionally, Schoenfeld's affidavit states that he heard Shekleton tell Deputy Eichenberger that he could not put his arm behind his back, and Joy Brummond's affidavit states that she believed Deputy Eichenberger observed Shekleton's arm tremoring. (Schoenfeld Aff. ¶ 14); (J. Brummond Aff. ¶ 13).

heard Deputy Eichenberger tell Shekleton to stop resisting. One of the two officers then attempted to help restrain Shekleton by grabbing his arm but was unable to do so.[6] At that point, Deputy Eichenberger yelled "taser, taser, taser" and discharged his taser at Shekleton with the probes striking Shekleton's upper chest and rib cage. The electric charge from the probes caused Shekleton to fall face-first to the ground, and as a result Shekleton suffered minor head injuries.

While Shekleton was on the ground, he was double-handcuffed, a process that allows for extra space between the arms. He was arrested for public intoxication and interference with official acts, but was taken to the hospital for treatment of his injuries before booking. The charges were later dropped.

We must now determine whether the district court was correct in finding that Shekleton's section 1983 action against Deputy Eichenberger is not barred by the doctrine of qualified immunity.

II.

Qualified immunity protects officers from liability in a section 1983 case "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009). "We review de novo a district court's denial of summary judgment on the basis of qualified immunity. We view the facts in the light most favorable to the plaintiff, accepting as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed." Id. at 495-96 (citation omitted).

---

[6]That officer stated in his deposition that Shekleton forcefully attempted to resist him and break free from his grip.

Evaluating a claim of qualified immunity requires a "two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. at 496.

We begin our inquiry by determining whether Shekleton has established that a violation of a constitutional or statutory right occurred. Shekleton claims Deputy Eichenberger violated his rights by using excessive force in violation of the Fourth Amendment because he deployed his taser. "'To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances.'" Johnson v. Carroll, 658 F.3d 819, 824 (8th Cir. 2011) (quoting Brown, 574 F.3d at 496). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . ." Id. at 826 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). "In determining reasonableness, a court considers the totality of the circumstances and 'the severity of the crime at issue, the immediate threat the suspect poses to the safety of the officer or others, and whether the suspect is actively resisting or attempting to evade arrest by flight.'" Smith v. Kan. City, Mo. Police Dept', 586 F.3d 576, 581 (8th Cir. 2009) (citation omitted). Force is "'least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public.'" Johnson, 658 F.3d at 827-28 (quoting Brown, 574 F.3d at 499).

Viewing the facts in the light most favorable to Shekleton, a reasonable officer would not have concluded that an argument occurred between Shekleton and Rausch. When Deputy Eichenberger arrived at the scene, Rausch was inside the bar, and Shekleton was leaving the area. Shekleton told Deputy Eichenberger repeatedly that he had not been arguing with Rausch. Shekleton complied with the officer's orders to step away from the street and did not behave aggressively towards Deputy

-6-

Eichenberger, nor did Shekleton direct obscenities towards Eichenberger or yell at him. When Deputy Eichenberger told Shekleton to place his arms behind his back, Shekleton told Deputy Eichenberger repeatedly that he could not physically do so. Shekleton's disability was well known in the community of New Hampton, and Eichenberger verbally acknowledged he was aware that Shekleton could not physically place his arms behind his back. Although Deputy Eichenberger and Shekleton fell apart from each other when Deputy Eichenberger attempted to handcuff Shekleton, Shekleton did not resist and did not intentionally cause the two to break apart.

Under these facts, Shekleton was an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him. Shekleton has established that a violation of a constitutional right occurred in that a reasonable officer would not have deployed his taser under the circumstances as presented by Shekleton. See Johnson, 658 F.3d at 827-28.

Having determined that Shekleton has established that a violation of a constitutional right occurred, we move to our next inquiry: determining whether Deputy Eichenberger's use of the taser against Shekleton constituted a clearly established constitutional violation. Deputy Eichenberger contends in his brief that at the time of the incident it was not a clearly established violation of law to use his taser under the circumstances and contends that our taser jurisprudence is in a state of flux.

When determining whether an action was a clearly established constitutional violation, we look to the state of the law at the time of the incident. Norman v. Schuetzle, 585 F.3d 1097, 1109 (8th Cir. 2009), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a

-7-

reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, 'even though the very action in question has [not] previously been held unlawful.'" Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)).

Deputy Eichenberger is correct that at the time of the incident, we had not yet had an opportunity to determine whether an officer's use of a taser on a nonviolent, nonfleeing misdemeanant was an excessive use of force. However, the right to be free from excessive force dates back to the adoption of the Bill of Rights of our Constitution, as it is "'a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person . . . .'" McGruder v. Heagwood, 197 F.3d 918, 919 (8th Cir. 1999) (quoting Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998)). That the level of force used must be justified in light of "the severity of the crime at issue," the suspect's flight risk, and the immediacy of the risk posed by the suspect to the safety of officers and others was the clearly established law on the night of the incident. Graham v. Connor, 490 U.S. 386, 396 (1989).

In Brown v. City of Golden Valley, 574 F.3d at 491, decided after the incident between Shekleton and Deputy Eichenberger, we were presented with an officer's use of a taser in facts similar to this case. There, we determined that the general law prohibiting excessive force in place at the time of the incident was sufficient to inform an officer that use of his taser on a nonfleeing, nonviolent suspected misdemeanant was unreasonable, even though we did not have a case specifically addressing officer taser use prior to the incident. Id. at 499-500.

As in Brown, we agree that the general constitutional principles against excessive force that were clearly established at the time of the incident between

Deputy Eichenberger and Shekleton were such as to put a reasonable officer on notice that tasering Shekleton under the circumstances as presented by Shekleton was excessive force in violation of the clearly established law.

## III.

For the foregoing reasons, we affirm the opinion of the district court denying Deputy Eichenberger's motion for summary judgment.

_____