# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2533

_____

Dedra Rudley, and Minor Child M.D.B.

*Plaintiff - Appellee*

v.

Little Rock Police Department; City of Little Rock

*Defendant*s

Hubert Bryant, In his individual and official capacity; Chris Oldham, In his
individual and official capacity

*Defendants - Appellants*

Kenton Buckner, Chief of Police, in his individual and official capacity

*Defendant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: April 16, 2019
Filed: September 3, 2019

_____

Before LOKEN, WOLLMAN, and STRAS, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Dedra Rudley filed suit under 42 U.S.C. § 1983, asserting that Little Rock Police Officers Hubert Bryant and Chris Oldham used excessive force in violation of the Fourth Amendment while arresting her and her minor son, M.D.B. The officers have appealed the district court's denial of their motion for summary judgment on the basis of qualified immunity. Because the officers' actions did not violate Rudley and M.D.B.'s clearly established rights, we reverse and remand.

Rudley and M.D.B. met with the principal of M.D.B.'s school just over a week after M.D.B. had suffered a broken clavicle during an altercation at school. When the meeting became hostile, the school principal requested that security officers escort Rudley and M.D.B. from the premises. Responding to the request, Bryant, serving as the School Resource Officer at the time, was told by the principal that Rudley had thrown a book at him. Bryant requested identification from Rudley, who stated that her identification was in her car. Bryant and Jerry Moore, a security guard employed by the school district, escorted Rudley and M.D.B. to the parking lot.

M.D.B. asserts that Bryant seemed to be agitated as the three proceeded to Rudley's vehicle in the parking lot. He also noticed that Bryant stood very close to Rudley while she looked for her identification and at one point appeared to reach for his gun. When M.D.B. asked what Bryant was reaching for, Bryant informed him that he was under arrest. As Bryant was proceeding around the back of Rudley's vehicle towards M.D.B., Rudley stepped in between the two of them before falling into Bryant.

Bryant disputes this account of the events in the parking lot. He contends that M.D.B. acted aggressively and threatened him. He asserts that when he informed M.D.B. that he was under arrest for terroristic threats, Rudley stepped in front of him and pushed him before falling to the ground.

-2-

The remainder of the interaction was captured on video by the camera attached to Bryant's taser. As M.D.B. helped Rudley up from the ground, Rudley exclaimed "wait a minute [expletive]" and then took a step towards Bryant as Bryant commanded her to "stop—get back." Bryant then deployed his taser on Rudley. As this was occurring, security guard Moore told M.D.B. to step away. He did so and then took a few steps towards Moore. The video then shows M.D.B. and Moore engaged in a physical altercation. Rudley retrieved papers from the ground and walked purposefully towards M.D.B. and Moore and away from Bryant, who then cycled his taser again on Rudley as she walked away. Bryant caught up with Rudley before she reached M.D.B. and Moore and took her down, at which point the camera was shaking or pressed against Rudley's clothes for approximately thirty seconds.

Bryant contends that he was forced to use his taser again after taking Rudley down because she "attempted to get up." Rudley and M.D.B. assert that Bryant was on top of Rudley, who was fully compliant, with his knee on her back or neck, an account contradicted by the video, the audio and the shaking nature of which are consistent with a physical struggle, during which Bryant informed Rudley that she was under arrest and ordered her to stop resisting. Although Rudley stated that she was not resisting, the video reveals that the scene became calm only after Bryant had used his taser a third time and was thereafter able to place Rudley in handcuffs.

Officer Oldham arrived in the meantime, arrested M.D.B. and handcuffed his wrists behind his back, which Rudley and M.D.B. allege exacerbated M.D.B.'s existing injury. Oldham's arrival and his subsequent arrest of M.D.B. are not shown on the video.

The officers moved for summary judgment, asserting that they were entitled to qualified immunity. Although the district court found that the scene, as shown on the video, was "chaotic and combative," it denied the officers' motion, concluding in part

that "the right to be free from excessive force, particularly physical force and repeated tasing was clearly established in May 2014."

The officers are entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to Rudley, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful. See Blazek v. City of Iowa City, 761 F.3d 920, 922-23 (8th Cir. 2014). "We review a district court's qualified immunity determination *de novo* and may resolve the appeal under either prong of the analysis." Id. at 923. The Supreme Court has emphasized that courts should not "define clearly established law at a high level of generality." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2017) (per curiam) (quoting City & Cty. of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1765-66 (2015)). Because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, . . . police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Id. at 1153 (internal quotation marks omitted). In other words, Rudley must identify controlling authority or "a robust 'consensus of cases of persuasive authority'" placing the constitutional question beyond debate. Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).

Turning first to the claims against Bryant, Rudley alleges that Bryant's repeated tasing violated her Fourth Amendment right to be free from the use of unreasonable force. In rejecting Bryant and Oldham's qualified immunity defense, the district court reasoned that Rudley and M.D.B. were unarmed, made no attempt to flee the scene, and did not appear to pose a "real threat" to the safety of the officers. The court then identified several disputes of material fact, among them whether Rudley assaulted Bryant and whether her actions after the first tasing justified the subsequent tasings.

Upon our *de novo* review, we conclude that neither Rudley nor the district court has identified controlling authority establishing a right to be free from any of the three tasings applied against Rudley. See Blazek, 761 F.3d at 925 (separating each "discrete use of force for consideration under the Fourth Amendment"). Rudley relies almost exclusively on Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012), in which the plaintiff complied with the arresting officer's orders and did not behave aggressively or direct obscenities at the officer. The plaintiff in that case told the officer that he was physically unable to comply with the order to place his arms behind his back and, although the two men fell to the ground while the officer attempted to effectuate the arrest, at no time did the plaintiff resist arrest or attempt to flee.

Our en banc court recently distinguished Shekleton in Kelsay v. Ernst, No. 17-2181, slip op. at *3 (8th Cir. Aug. 13, 2019) (en banc). There, officers arrived on scene after learning of a purported pool-side assault. Id. at *1. The defendant officer Ernst attempted to arrest Kelsay, a diminutive woman clad only in swimwear, upon learning that she had attempted to interfere with an arrest. Kelsay began to walk away from Ernst and towards her daughter, who was involved in a verbal altercation with a female patron near the pool exit. Ernst followed her, grabbed her arm, and told her to "get back here." Kelsay replied, indicating that she wished to confront the other patron, and kept walking toward her daughter and the patron. Ernst bear-hugged her and threw her to the ground, breaking her clavicle. Id. at *2. We reversed the denial of qualified immunity, concluding that no precedent clearly established that Ernst's takedown was unreasonable at the time of the incident.

The situation here, involving aggressive behavior and a "chaotic and combative" scene, D. Ct. Order of June 20, 2018, at 3, is unlike Shekleton and more akin to the situation in Kelsay. Prior to their altercation, Bryant believed Rudley to have thrown a book at the principal, just as Ernst had been told that Kelsay had interfered with an arrest before his arrival. Rudley then physically inserted herself

-5-

between M.D.B. and Bryant, directed an expletive at Bryant, and stepped toward him, ignoring his command to stop. Following the first tasing and continuing through the second, Rudley further contravened Bryant's prior command by walking toward M.D.B. and Moore. Like Kelsay, Rudley may have seemingly posed little physical danger to the officers, shod as she was in high-heeled shoes. Based on Rudley's behavior and the information known to Bryant at the time, however, "a reasonable officer in [Bryant]'s position could have believed that it was important to control the situation and to prevent a confrontation . . . that could escalate." Kelsay, slip op. at *7.

Rudley's was not the case of an individual "who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him." Shekleton, 677 F.3d at 366. Nor was Rudley like the seat-belt-restrained passenger cowering in her automobile, as was the case in Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009). Rather, as in Kelsay, the scene was a tumultuous one involving seemingly aggressive and noncompliant behavior, circumstances which we have previously held rendered officers' uses of tasers reasonable. See Cook v. City of Bella Villa, 582 F.3d 840, 851 (8th Cir. 2009) (holding that an officer's use of his taser during a "rapidly escalating situation" was reasonable when an individual had stepped out of his vehicle and taken a step towards the officer); see also Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012) (holding that it was not unreasonable for an officer to use his taser on an individual lying on the ground who had refused officers' orders to present his hands for cuffing). "In light of these authorities, we cannot conclude that [Rudley] has identified 'a robust consensus of cases' that placed the excessive force question 'beyond debate' at the time of [the] alleged violation." Murphy v. Engelhart, No. 18-3054, slip op. at *4 (8th Cir. Aug. 14, 2019) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741-42 (2011)).

Finally, we conclude that Officer Oldham did not violate a clearly established right by handcuffing M.D.B.'s wrists behind his back. Although the precise timing

of the handcuffing is not established by the video, Oldham arrived in the midst of a highly combative situation. While Bryant was engaged with Rudley, M.D.B. can be seen on the video physically wrestling with Moore. Oldham could have reasonably believed that M.D.B. presented a threat to him and his fellow officers, and he applied only a minimal degree of force. Rudley and M.D.B. cite no case holding that the use of a similar degree of force was unreasonable in circumstances similar to those here.

The district court's order is reversed, and the case is remanded for the entry of summary judgment in favor of the officers.

———————————————