2013 Ark. 160

**Elmer GRAHAM, Individually and in his Official Capacity, Appellant**

v.

**Iris CAWTHORN, Appellee.**

No. 12–959.

Supreme Court of Arkansas.

April 18, 2013.

Michael Mosley, North Little Rock, for appellant.

Luther Oneal Sutter, Little Rock, for appellee.

JIM HANNAH, Chief Justice.

This is an interlocutory appeal of an order of the Prairie County Circuit Court denying appellant Elmer Graham's motion for judgment on the pleadings on immunity grounds. In addition, the appeal raises issues concerning collateral estoppel and the preclusive effect of a federal-court judgment on a state-court action.[1] Because we conclude that Graham is entitled to qualified immunity on one claim and that collateral estoppel bars the remaining claims, we reverse and remand.

---

1. Ordinarily, in interlocutory appeals of orders denying motions based on the defense of qualified immunity, our review is limited to the issue of whether the circuit court erred in determining that an official was not entitled to immunity from suit, and we do not consider any other arguments raised by the parties. *E.g., City of Farmington v. Smith,* 366 Ark. 473, 237 S.W.3d 1 (2006). Here, we address the collateral-estoppel issues because they involve closely related questions of law. *See Virden v. Roper,* 302 Ark. 125, 788 S.W.2d 470 (1990) (stating that in interlocutory appeals on the issue of qualified immunity, the court will address closely related questions of law, which in good sense and judicial economy, ought to be decided).

Graham was an officer with the Des Arc Police Department when he arrested appellee Iris Cawthorn in November 2007 for disorderly conduct and refusal to submit to arrest. Cawthorn was convicted of both offenses in district court and appealed to the circuit court, which overturned the disorderly-conduct conviction. Cawthorn brought suit against Graham in his individual and official capacities in the United States District Court for the Eastern District of Arkansas under 42 U.S.C. § 1983, the Arkansas Constitution, and the Arkansas Civil Rights Act. *See Roe v. Graham*, No. 2:09–cv–98 (DPM), 2010 WL 4916328 (E.D.Ark. Nov. 23, 2010). She alleged that Graham arrested her without probable cause and used excessive force. *Id.* She also alleged that Graham arrested her because she exercised her rights to free speech and her right to petition the government for redress and remonstration of grievances. *Id.* Further, Cawthorn alleged that the constitutional violations were caused by a failure to train, a failure to supervise, and a policy of using excessive force, implemented and ratified by the policy makers of Des Arc. *Id.*

After a trial on the merits, the federal district court entered the following findings of fact and conclusions of law:

Findings of Fact

1. Elmer Graham was an officer with the Des Arc, Arkansas, Police Department when he arrested Iris Cawthorn in November 2007. He has been a certified law-enforcement officer since 1995 and has had continuing law-enforcement training since he completed the basic-training course. Officer Graham has been trained in the proper use of force and when to use it.

2. Officer Graham lawfully arrested Cawthorn's son, Robert "Sonny" Cawthorn, one day in November 2007. Officer Graham then drove Robert to the Prairie County Sheriff's Office for processing.

3. Cawthorn knew her son was going to be arrested based on a phone call he had made to her shortly before his arrest. Cawthorn was not surprised that her son had been arrested because she knew about an outstanding warrant against him. She arrived at the Sheriff's Office a short time after her son and Officer Graham got there. She went to the station to check on her son, who sometimes has trouble breathing and requires an inhaler.

4. Officer Graham had yet to transfer Robert from his car and into the jail when Cawthorn approached them. They all met in the parking lot, which was open to the public. The testimony conflicted on what exactly Cawthorn said to Officer Graham and how she said it. But the Court need not resolve this conflict.

5. What is clear is that Officer Graham told Cawthorn that he could not help her and that she should see a local District Judge about the arrest warrant. He also told her to leave so that he could process her son into the jail. Cawthorn complied.

6. While driving away, Cawthorn saw an ambulance heading to the Sheriff's Office. She became concerned that the emergency personnel had been called to treat her son's breathing problems. She turned the car around and drove back to the Sheriff's Office.

7. The parties agreed at trial that Cawthorn's claims turn on her second trip to the Sheriff's Office. The Court agrees, and therefore concentrates on that event.

8. Cawthorn went inside the Sheriff's Office and asked to speak with Officer Graham again. She began asking loudly about her son and complaining about

his arrest. Cawthorn was causing a disturbance, so some personnel asked Officer Graham to go up front and talk to her. At this point, Officer Graham was in the back of the jail working on the paperwork to complete Robert's arrest. Having to deal with the disturbance interfered with Officer Graham's duty to process Robert's arrest.

9. The front door of the Prairie County Sheriffs office opens into a small, hall-like lobby, approximately eight feet wide and ten feet long. The lobby contains a few chairs. There is a counter beneath a plexiglass window in a wall that separates the lobby from the dispatch area. Visitors can talk with the office staff through the window. The dispatch area includes the dispatcher's work station and desks for officers. A door provides access from the lobby to the dispatch area. The lobby is a public space routinely used by citizens.

10. The particulars of Cawthorn's demeanor and behavior in the lobby were much disputed. But the Court credits Officer Graham's testimony that Cawthorn was disrupting the staff's ability to work in the dispatch area. The dispatcher, a hesitant witness, wobbled on this issue depending on who was doing the questioning; so the Court gives little weight to her testimony. Deputy Bradley Taylor was working in that area when Cawthorn was in the lobby. He heard the disturbance but not exactly what was said. The Court also credits Deputy Taylor's testimony that Cawthorn's behavior impaired the dispatcher's ability to handle calls effectively and eventually interrupted Deputy Taylor's own work.

11. Officer Graham testified that Cawthorn was getting angry and becoming more belligerent while talking with him about her son. Officer Graham also said that he did not think he could de-escalate the situation, so he told her to leave. He said that by this time Cawthorn was right below raging and would not leave after she was told twice to do so.

12. No other member of the public besides Cawthorn was in the lobby during the disturbance. She never acted violently, damaged any property, threatened anyone, approached anyone aggressively, or cursed any person. Officer Graham nonetheless warned Cawthorn that if she did not leave and end the disturbance she was causing then she would be arrested. Cawthorn refused to comply with the warning, so Officer Graham told her that she was under arrest.

13. Officer Graham placed his hands on Cawthorn's hand to make the arrest. According to her testimony, which was corroborated by Officer Graham, Cawthorn twisted out of his hands. Officer Graham then put one arm around her shoulder, with one hand on the nape of her neck, and embraced her against the counter with his body. He told her again that she was under arrest.

14. Officer Graham also told Cawthorn that if she did not submit to arrest, then he would pepper spray her. Cawthorn submitted. Officer Graham testified that he took Cawthorn's size, age, and physical condition into account when deciding how much force to use when he arrested her. The Court credits his testimony. Though he threatened its use, Officer Graham never pepper sprayed Cawthorn; nor was she handcuffed during or after the arrest.

15. After Cawthorn was arrested by Officer Graham, Deputy Taylor helped calm her down and escorted her to a holding area where her son was being held. Cawthorn was detained a short period of time and then released. Depu-

ty Taylor described Cawthorn as harassing Officer Graham in a report Taylor wrote after the arrest.

16. Cawthorn never complained of any injury to Deputy Taylor, Officer Graham, or any other person at the Sheriff's Office. She did not tell Officer Graham that he was hurting her during the arrest. She did not cry out in pain or ask Officer Graham to stop hurting her.

17. Cawthorn was not immediately treated by any health-care provider for any injuries—physical or psychological—that were allegedly caused by Officer Graham. About eight months after the arrest, Cawthorn had an MRI done on her neck and back. She agreed that she had problems with these areas before the arrest, though she said the arrest made those problems worse. Cawthorn agreed that she lost no income due to the arrest; but she was embarrassed by it, and she reduced her visits to town afterward. She also testified that the arrest made her long-standing depression worse and that she cried for weeks afterward.

18. Cawthorn was charged with disorderly conduct and refusing to submit to arrest, and then convicted of both in a state District Court. She appealed her convictions to a state Circuit Court, which upheld the refusal-to-submit conviction and overturned the disorderly conduct conviction.

19. Sometime after her arrest, Cawthorn complained about her arrest to the City of Des Arc Police Department. Cawthorn also tried to file criminal battery charges against Officer Graham. No prosecutor pursued these charges.

20. Des Arc Chief of Police Darrell Turner testified that he turned the investigation about the arrest over to the Prairie County Sheriff's Office. Sheriff Gary Burnett investigated Cawthorn's complaint.

21. When Cawthorn was arrested, Des Arc had in place no policies or customs requiring or permitting officers to use more force than necessary to make an arrest. The documentary evidence supports this fact.

22. No reviewing official or entity found that Officer Graham violated Des Arc's written policy on the use of force. Officer Graham was never disciplined by any supervising authority for how he treated Cawthorn.

23. Based on the proof, the Court is not persuaded that the City was deliberately indifferent to Cawthorn's complaint of excessive force. The Mayor received Cawthorn's complaint and Chief Turner referred it to the Prairie County Sheriff's Office for investigation by a third party. That no disciplinary action was taken against Officer Graham is not necessarily proof of deliberate indifference or a policy that condones (tacitly or otherwise) the use of excessive force. More is required.

24. No proof supports the allegation that Des Arc failed to train Officer Graham on constitutional standards or inadequately supervised him. The documentary evidence shows, instead, that Officer Graham received more than six hundred hours of training—in many subject areas, including use of force—over a fourteen-year period. Further, no testimony at trial cast any meaningful doubt on Officer Graham's training or the way in which he was supervised.

Conclusions of Law

25. The Court has already dismissed Cawthorn's federal unlawful-arrest claim without prejudice based on *Heck v. Humphrey* [, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) ]. Having considered her section 1983 claim that

Officer Graham used excessive force during the arrest, the Court concludes that the claim fails on the proof.

26. Officer Graham did not use excessive force when he arrested Cawthorn. The Fourth Amendment's reasonableness test applies to excessive-force claims. *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir.2009). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown*, 574 F.3d at 496 (internal quotation omitted). The reasonableness of the force is viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid.* Here, Officer Graham acted in an objectively reasonable manner in the circumstances the Court has already discussed. The law on point also asks whether and to what extent Cawthorn was injured during the arrest. Cawthorn did not persuade the Court that she was injured during the arrest. This conclusion also undermines her section 1983 claim. *E.g., Wertish v. Krueger*, 433 F.3d 1062, 1066–67 (8th Cir.2006) (collecting cases on excessive-force injuries).

27. Cawthorn failed to present sufficient evidence to establish a right to recover under section 1983 for a failure to train or a failure to supervise. She also failed to prove that Des Arc had in place any policy or custom permitting officers to use excessive force to make an arrest.

28. Now to Cawthorn's free-speech claim based on the First Amendment to the United States Constitution. The question is a close one, the hard issue in this case. The Court concludes that Cawthorn's section 1983 claim based on the First Amendment fails on the record presented.

29. Cawthorn's right to speak her mind to public servants like Officer Graham about her son's arrest, and much else, is broad. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Texas v. Hill*, 482 U.S. 451, 462–63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *see also Gainor v. Rogers*, 973 F.2d 1379, 1387 (8th Cir. 1992). The Eighth Circuit has recently been clear that merely raising one's voice, pointing, and cursing a law-enforcement officer—if done at some distance and while approaching in a "non-aggressive manner"—are protected expressive acts. *Copeland v. Locke*, 613 F.3d 875, 879–80 (8th Cir.2010). "It is ... fundamental that a lawful arrest may not ensue where the arrestee is merely exercising [her] First Amendment rights." *Copeland*, 613 F.3d at 880 (internal quotation omitted).

30. The Eighth Circuit has also held that "[t]o prevail in an action for First Amendment retaliation, [Cawthorn] must show a causal connection between [Officer Graham's] retaliatory animus and [Cawthorn's] subsequent injury." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir.2010) (internal quotation omitted). Cawthorn must also show that retaliation was "a substantial factor in the decision to arrest." *Ibid.* (internal quotation omitted). And she "must show that the retaliatory motive was a but-for cause of the arrest," meaning that Officer Graham "singled out" Cawthorn because she chose to express her opinions. *Ibid.* (internal quotations omitted). The Court is not convinced that Officer Graham arrested Cawthorn because of what she was say-

ing. Nor is the Court convinced that retaliation was a substantial factor in the arrest. Officer Graham testified that he did not arrest Cawthorn based on what she said to him or because of their stand-off earlier that day. Had Officer Graham been grinding an axe when he arrested Cawthorn, then he would have acted unlawfully: "[P]olice officers ... may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity." *Nichols v. Chacon,* 110 F.Supp.2d 1099, 1107 (W.D.Ark. 2000).

31. Cawthorn was arrested because her loud and escalating behavior disrupted police work at the Sheriff's Office. Considering the record as a whole, the Court concludes that this was more than an interruption of police activities by an angry citizen. That situation is routine; and law-enforcement officers must respond to it with great patience informed by a healthy respect for the First Amendment. Officer Graham's efforts to reason with Cawthorn, calm her down, or persuade her to leave the lobby failed. Rather than simmering down, the situation heated up.

32. Officer Graham was on firm ground when he determined that he had probable cause to arrest Cawthorn under Arkansas's disorderly conduct statute. Cawthorn makes no constitutional challenge to the statute's validity. *Compare City of Houston, supra.* That statute provides in part:

(a) A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she:

. . .

(2) Makes unreasonable or excessive noise[.]

Ark.Code Ann. § 5–71–207 (Supp. 2009). Keeping in mind that the concept is fluid, the Court concludes that Officer Graham had probable cause to arrest Cawthorn under subsection (a)(2) of the disorderly conduct statute.

33. Context is critical. Unlike *Locke*— which involved a Missouri statute with different terms—this event occurred indoors and within the small public space adjoining the communication/operation center of the Prairie County Sheriff's Office. The Court's probable-cause analysis is particularly informed by Officer Graham's testimony that he could not calm Cawthorn down and that she was in a near rage. Arkansas police officers may consider a person's demeanor in deciding whether to arrest under the statute. *Watkins v. State,* 2010 Ark. App. 85, at 2–6, 8–10, 2010 WL 305312, at 2, 4–5. Officer Graham did so, and decided in light of all the circumstances that he had probable cause to arrest her. The Court agrees. Cawthorn's federal free-speech claim therefore fails because she must establish, among other things, that Officer Graham lacked probable cause to arrest her. *McCabe v. Parker,* 608 F.3d 1068, 1075 (8th Cir.2010).

34. Cawthorn also claims that Officer Graham violated her rights under the Arkansas Constitution and the Arkansas Civil Rights Act. She argues from her right to protest—to remonstrate—inside the Sheriff's Office about how her son was being treated, contending that this is protected speech under the Arkansas Constitution. Article 2, Section 4 states: "The right of the people peaceably to assemble, to consult for the common good; and to petition, by address or remonstrance, the government, or any department thereof, shall never be

abridged." Cawthorn seeks to vindicate this right through the liability provision of the Arkansas Civil Rights Act. Ark. Code Ann. § 16–123–105 (Repl.2006).

35. Her remonstration claim is akin to a retaliation claim under the First Amendment to the Federal Constitution. Cawthorn argued during the Rule 52(c) motions, however, that the Arkansas Constitution may provide more protection to her speech than the Federal Constitution. She is correct. *E.g., State v. Brown,* 356 Ark. 460, 466–70, 156 S.W.3d 722, 727–29 (2004); *Scott v. State,* 347 Ark. 767, 784–88, 67 S.W.3d 567, 579–82 (2002) (Hannah & Thornton, JJ., concurring). But in the circumstances presented, the Court declines to decide Cawthorn's speech claim under state law. To do so, this Court would have to predict how the Arkansas Supreme Court would hold on at least two issues: what does the right to remonstrate mean? And how does that right apply in a law-enforcement context? These important and complex legal questions have not been squarely addressed by an Arkansas appellate court. This fact cuts against the Court exercising supplemental jurisdiction. 28 U.S.C.A. § 1367(c)(1) (West 2006). Second, the Court has decided against Cawthorn on all her federal claims. This fact also counsels against deciding a supplemental state-law claim. 28 U.S.C.A. § 1367(c)(3). The Court concludes that the more prudent course is to dismiss Cawthorn's free-speech claim under state law without prejudice. *Gibson v. Weber,* 433 F.3d 642, 647 (8th Cir.2006) (District Courts have discretion to decline exercising supplemental jurisdiction); *McLaurin v. Prater,* 30 F.3d 982, 984–85 (8th Cir.1994) (District Court should exercise jurisdiction unless it finds that subsection (c)'s factors counsel against doing so).

36. In summary, based on the testimony, documentary evidence, and the law, Cawthorn has not established any violation of federal law. All her federal claims—except the unlawful-arrest claim the Court dismissed based on *Heck*—are dismissed with prejudice. All her state-law claims are dismissed without prejudice.

*Roe v. Graham, supra* (footnotes omitted).

After Cawthorn's federal case was dismissed, she brought suit against Graham in his individual and official capacities in Prairie County Circuit Court. The suit was virtually identical to the suit brought in federal court, except that all references to federal law were removed. Thus, she brought suit pursuant to the Arkansas Constitution and the Arkansas Civil Rights Act and alleged that Graham arrested her without probable cause and used excessive force and that Graham arrested her because she exercised her rights to free speech and her right to petition the government for redress and remonstration of grievances. Further, Cawthorn alleged that the constitutional violations were caused by a failure to train, a failure to supervise, and a policy of using excessive force, implemented and ratified by the policy makers of Des Arc.

Graham filed a motion for judgment on the pleadings, arguing that Cawthorn's cause of action was barred by collateral estoppel and that he was entitled to qualified immunity. After a hearing, the circuit court denied Graham's motion, and he now brings this interlocutory appeal.

■ On appeal, Graham contends that, even though the federal court declined to exercise supplemental jurisdiction over Cawthorn's state-law claims when it disposed of her § 1983 claims, collateral estoppel bars relitigation of facts and issues already decided by the federal court. Al-

ternatively, he contends that even if Cawthorn's state-court action is not barred by collateral estoppel, he is entitled to qualified immunity. Cawthorn contends that collateral estoppel does not apply because her state-law claims raise different issues than those decided by the federal court. She also contends that the legal standards for evaluating her state-law claims are different from the legal standards used by the federal court to evaluate her federal-law claims. Finally, Cawthorn contends that her cause of action in state court is not barred by collateral estoppel because the federal court declined to exercise supplemental jurisdiction over her state-law claims.

Collateral estoppel, the issue-preclusion facet of res judicata, bars relitigation of issues of law or fact previously litigated, provided that the party against whom the earlier decision is being asserted had a full and fair opportunity to litigate the issue in question and that the issue was essential to the judgment. *E.g., Morgan v. Turner,* 2010 Ark. 245, 368 S.W.3d 888. To apply collateral estoppel, the following elements must be present: (1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the issue must have been determined by a valid and final judgment, and (4) the determination must have been essential to the judgment. *Id.*

This court has recognized that a federal court judgment may preclude relitigation of issues in state court. *See Scogin v. Tex–Ark Joist Co.,* 281 Ark. 175, 662 S.W.2d 819 (1984). Cawthorn cites *Virden v. Roper,* 302 Ark. 125, 788 S.W.2d 470 (1990), for the proposition that her action in state court is not barred by collateral estoppel because the federal court made an express reservation of rights as to future litigation. Cawthorn, however, misstates this court's holding in *Virden.*

In *Virden,* the appellee filed an action against the appellants in federal district court pursuant to 42 U.S.C. § 1983 and alleged that he was denied due process and equal protection under the Fourteenth Amendment based on violations of state statutes affecting civil-service procedures. While the district court expressed doubt that the appellee had stated a § 1983 cause of action, it saw the issues as a matter of harmonizing state statutes and civil-service regulations—issues more appropriate for state courts to decide—and elected to abstain, dismissing the complaint without prejudice. *See Roper v. City of Pine Bluff,* 673 F.Supp. 329 (E.D.Ark.1987). The appellee then filed suit in the state circuit court on essentially the same grounds. The appellants contended that the dismissal by the district court rendered the appellee's § 1983 cause of action res judicata. We disagreed, stating,

> The order itself ... reflects that dismissal was grounded on the abstention doctrine, and the general comments questioning whether a § 1983 cause of action was stated were merely dicta. Those comments, seemingly gratuitous, were not essential to the holding of the District Court and do not preclude the appellee from filing suit in state court. *See Leslie v. Bolen,* 762 F.2d 663 (8th Cir.1985).

*Virden,* 302 Ark. at 129, 788 S.W.2d at 472. Thus, in *Virden,* all of the claims had been dismissed without prejudice, none of the parties' issues were resolved, and the district court's dicta did not preclude relitigation. Nowhere in *Virden* did we announce a bright-line rule that collateral estoppel does not bar a subsequent action where a federal court has made an express reser-

vation of rights as to future litigation.[2] To the contrary, in some instances, collateral estoppel may bar a subsequent action in state court even if the federal court has declined to exercise supplemental jurisdiction.

In the instant case, an examination of Cawthorn's claims reveals that, with one exception,[3] the federal court has already resolved the issues that Cawthorn seeks to have resolved in state court. In both her federal-court complaint and her state-court complaint, Cawthorn alleged that she was arrested without probable cause. The federal court, relying on *Heck v. Humphrey*, held that Cawthorn could not pursue her § 1983 claim for unlawful arrest unless her state-court convictions were invalidated. *Roe v. Graham, supra.* Additionally, the federal court concluded that Graham had probable cause to arrest Cawthorn for disorderly conduct. *Id.* Cawthorn appears to contend that, even if Graham had probable cause to arrest Cawthorn under federal law, he did not have probable cause to arrest her under Arkansas law, so the federal court's ruling has no bearing on her Arkansas claim. Cawthorn is mistaken. Arkansas law governing the test for probable cause to arrest does not differ from the federal-law test. This court, relying on federal law, has held that "[p]robable cause exists if 'at the moment the arrest was made ... the facts and circumstances within [a police officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the person arrested committed the crime with which he was charged." *Baldridge v. Cordes,* 350 Ark. 114, 120–21, 85 S.W.3d 511, 515 (2002) (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *Robinson v. Beaumont,* 291 Ark. 477, 485–86, 725 S.W.2d 839, 843–44 (1987). Here, the federal court considered the facts and circumstances within Graham's knowledge at the time and determined that Graham was on "firm ground" when he determined that he had probable cause to arrest Cawthorn for disorderly conduct. *Roe v. Graham, supra.* The issue of probable cause is the same in both the federal cause of action and the state cause of action, the issue was actually litigated in federal court, the issue was determined by a valid and final judgment, and the determination of probable cause was essential to the judgment. As such, Cawthorn is barred from raising the issue of probable cause in state court.

Cawthorn alleged in both complaints that Graham used excessive force when he arrested her. As noted by the federal court, the Fourth Amendment's reasonableness test applies to excessive-force claims. *Brown v. City of Golden Valley,* 574 F.3d 491 (8th Cir.2009). The test is "whether the amount of force used was objectively reasonable under the particular circumstances." *Id.* at 496 (internal quotation omitted). While this court has not set out a test for excessive-force claims arising under the Arkansas Civil Rights Act (ACRA), the ACRA specifically provides that a court may look for guidance to state and federal decisions interpreting the federal Civil Rights Act, 42

**2.** We note that Cawthorn also relies on *Guidry v. Harp's Food Stores, Inc.*, 66 Ark.App. 93, 100, 987 S.W.2d 755, 758–59 (1999), where the court of appeals, citing *Virden, supra,* stated that "collateral estoppel does not bar a subsequent action where a federal court has made an express reservation of rights as to future litigation." As we have already explained, this was not our holding in *Virden.* To the extent that *Guidry* states otherwise, it is overruled.

**3.** The federal court did not resolve issues regarding Cawthorn's right-to-remonstrate claim.

U.S.C. § 1983. *See* Ark.Code Ann. § 16–123–105(c). And we note that the court of appeals has relied on federal precedent to analyze an excessive-force claim under the ACRA. *See Martin v. Hallum*, 2010 Ark. App. 193, 374 S.W.3d 152. In any event, Cawthorn does not allege that a legal standard different from the Fourth Amendment reasonableness test would apply to her excessive-force claim. In fact, she concedes in her brief on appeal that the law governing her claim for excessive force under the ACRA would not be substantially different from the law governing her federal claim. The issue of excessive force is the same in both causes of action, was actually litigated, and was determined by a valid and final judgment. Moreover, the determination of the issue of excessive force was essential to the judgment. Accordingly, Cawthorn is barred from raising the issue of excessive force in state court.

■ Cawthorn alleged in both complaints that Des Arc had in place a policy or custom permitting officers to use excessive force to make an arrest. The federal court resolved this issue when it concluded that she had failed to prove her policy-or-custom claim,[4] and Cawthorn does not contend that the analysis of this issue would be different under state law. The issue is the same in both courts, and it was actually litigated. The issue was determined by a valid and final judgment, and that determination was essential to the

judgment. Consequently, Cawthorn is collaterally estopped from raising the issue in state court.

■ The issue of whether Graham violated Cawthorn's right to remonstrate was not resolved by the federal court, so Cawthorn is not barred from raising the issue in state court. Cawthorn contends that her right to remonstrate inside the sheriff's office is protected speech under Arkansas Constitution, article 2, section 4: "The right of the people peaceably to assemble, to consult for the common good; and to petition, by address or remonstrance, the government, or any department thereof, shall never be abridged." Graham contends that he is entitled to qualified immunity because a reasonable officer in his position would not know that arresting someone based on facts demonstrating probable cause could violate that person's right to remonstrate under the Arkansas Constitution.

Graham's claim of qualified immunity is based on Arkansas Code Annotated section 21–9–301 (Supp.2011), which provides,

(a) It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, special improvement districts, and all other public subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be immune from liability

---

4. In *Gentry v. Robinson*, 2009 Ark. 634, 361 S.W.3d 788, we noted that

> a plaintiff may establish … liability under § 1983 by showing that her constitutional rights were violated by an action pursuant to official municipal policy or by misconduct so pervasive among employees of the county as to constitute a custom or usage with the force of law. *Ware v. Jackson County, Missouri*, 150 F.3d 873 (8th Cir. 1998). A "custom or usage" is demonstrated by (1) the existence of a continuing, widespread, persistent pattern of unconsti-

> tutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policy-making officials after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.
> *Ware*, 150 F.3d at 882.

*Id.* at 21, 361 S.W.3d at 799.

and for suit from damages except to the extent that they may be covered by liability insurance.

(b) No tort action shall lie against any such political subdivision because of the acts of its agents or employees.

■ In cases involving immunity under section 21–9–301, we apply the same analysis that is utilized when addressing the issue of qualified immunity of state employees under Arkansas Code Annotated section 19–10–305 (Repl.2007). *See Smith v. Brt,* 363 Ark. 126, 211 S.W.3d 485 (2005). In interpreting our qualified-immunity statutes, we have traditionally been guided by the analysis adopted by the United States Supreme Court for qualified-immunity claims in federal civil-rights actions. *E.g., Fegans v. Norris,* 351 Ark. 200, 89 S.W.3d 919 (2002). Under that analysis, a motion for summary judgment based on qualified immunity is precluded only when the plaintiff has asserted a constitutional violation, *demonstrated the constitutional right is clearly established,* and raised a genuine issue of fact as to whether the official would have known that the conduct violated that clearly established right. *Smith v. Brt, supra* (emphasis added).[5]

■ The Supreme Court of the United States has recognized that "courts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Reichle v. Howards,* —— U.S. ——, ——, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (citing *Pearson v. Callahan,* 555 U.S. 223, 236–37, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). To be "clearly established," a right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle,* —— U.S. at ——, 132 S.Ct. at 2093 (citing *al-Kidd,* 563 U.S. at ——, 131 S.Ct. at 2083).

We conclude that the "clearly established" standard is not met in this case. In *Roe v. Graham,* the federal court concluded that a remonstration claim under the Arkansas Constitution is akin to a retaliation claim under the First Amendment. Cawthorn appears to agree with the federal court's comparison, but she contends that article 2, section 4 of the Arkansas Constitution provides more protection to her speech than does the United States Constitution. Suffice it to say that this court has never addressed whether a remonstration claim under the Arkansas Constitution is similar to a retaliation claim under the First Amendment, nor have we addressed whether article 2, section 4 provides more protection to Cawthorn's speech than does the United States Constitution. We need not decide those issues today. *See Reichle, supra.* The lack of precedent alone makes it clear that Cawthorn's right to remonstrate, as she understands it, was not clearly established at the time of her arrest in 2007. Accord-

5. In this case, the circuit court denied Graham's motion for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as a motion for summary judgment. Ark. R. Civ. P. 12(c). In this case, Graham attached as an exhibit the federal-court memorandum and opinion in *Roe v. Graham* in support of his motion that he was entitled to qualified immunity, and the circuit court did not exclude the exhibit. Therefore, we will treat the motion as one for summary judgment. *Cf. Rowe v. Hobbs,* 2012 Ark. 244, 410 S.W.3d 40 (stating that it is well settled that when a circuit court considers matters outside the pleadings, the appellate court will treat a motion to dismiss as one for summary judgment).

ingly, Graham is entitled to qualified immunity on Cawthorn's right-to-remonstrate claim.

■ Finally, Cawthorn alleged failure-to-train and failure-to-supervise claims against Graham in his official capacity. An official-capacity suit is not a suit against that person; rather, it is a suit against the city for which the officer works. *Smith v. Brt, supra.* Here, Cawthorn's claims cannot be sustained because there is no underlying constitutional violation by Graham. *See Sitzes v. City of W. Memphis,* 606 F.3d 461, 470–71 (8th Cir. 2010) (holding ⌊18that the plaintiffs's failure-to-train and failure-to-supervise claims could not be sustained absent an underlying constitutional violation by the officer).

Reversed and remanded.