Cite as 2019 Ark. App. 570

# ARKANSAS COURT OF APPEALS
DIVISION IV
**No.** CV–18–934

| | |
|---|---|
| BRODIE FAUGHN AND BILLY COLVIN | **Opinion Delivered:** December 4, 2019 |
| | APPEAL FROM THE ST. FRANCIS COUNTY CIRCUIT COURT |
| APPELLANTS | [NO. 62CV-16-180] |
| V. | HONORABLE RICHARD L. PROCTOR, JUDGE |
| ALFRED KENNEDY AND WAYNE KENNEDY | |
| APPELLEES | AFFIRMED IN PART AND REVERSED AND DISMISSED IN PART |

## MEREDITH B. SWITZER, Judge

Alfred Kennedy and his son, Wayne Kennedy, filed a complaint against Brodie Faughn, Billy Colvin, and John Does 1 and 2. Faughn was a police officer for the City of Wynne, and Colvin was police chief for the City of Cherry Valley. The Kennedys allege that the officers were agents and employees of their respective cities and acting under color of state law. The complaint contains factual allegations describing actions taken by the individual defendants against either Wayne or Alfred Kennedy. The Kennedys sought compensatory and punitive damages for the alleged torts of assault, battery, and false arrest, and for violations of their civil rights under the Arkansas Civil Rights Act (ACRA), Arkansas Code Annotated sections 16-123-101 to -108 (Repl. 2016). Faughn and Colvin answered the complaint "each in their official capacities," denied the allegations of wrongdoing, and asserted entitlement "to absolute, qualified, good faith, and statutory immunity." The

officers affirmatively asserted that at no time had the policies, practices, or customs of the cities of Wynne or Cherry Valley resulted in a violation of the Kennedys' constitutional rights; however, no allegations of this type were made in the complaint. The officers subsequently moved for summary judgment on the basis of qualified immunity. The St. Francis County Circuit Court denied the officers' motion and this interlocutory appeal followed.[1] Faughn and Colvin raise two points on appeal: (1) the trial court erred in characterizing the ACRA claims against the officers as "individual-capacity" claims and in subsequently denying the officers qualified immunity; and (2) the trial court erred in denying them qualified immunity on the Kennedys' tort claims because the force used by the officers was reasonable. We affirm in part and reverse and dismiss in part.

## I. *ACRA Claims*

Faughn and Colvin's first argument on appeal is two-fold. First, they contend the trial court erred by interpreting the Kennedys' ACRA claims as claims against them in their individual capacities rather than their official capacities. Furthermore, Faughn and Colvin contend that even if the claims were correctly regarded as individual-capacity claims, they were still entitled to qualified immunity, and the trial court erred in denying them summary judgment on that basis.

### A. Individual-Capacity Versus Official-Capacity Claims

We begin with the "individual-capacity" portion of Faughn and Colvin's argument and hold that the trial court did not err in interpreting the ACRA claims as individual-capacity claims. None of the parties has cited an Arkansas case that controls the

---

[1]Ark. R. App. P.–Civil 2 (a)(10) (2018).

determination of whether a defendant has been sued in his or her individual or official capacity, and our research has not revealed one either. However, ACRA specifically provides that we may look to federal decisions construing 42 U.S.C. § 1983 as persuasive authority in construing Arkansas Code Annotated section 16-123-105.[2] The distinction between individual-capacity and official-capacity claims is important. Individual-capacity claims seek to impose personal liability upon a government official for actions he or she takes under color of state law. *Kentucky v. Graham*, 473 U.S. 159 (1985). Official-capacity claims are asserted against an entity of which the officer is an agent. They are not suits against the official personally; the entity is the real party in interest. *Id*. An award of damages against a government official in his or her individual capacity can be executed only against the official's personal assets, while a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself. *Id*.

To establish individual liability in a Section 1983 action, it is sufficient to show that the official being sued acted under color of state law and caused the deprivation of a federal right. *Id*. For a governmental entity to be held liable in an official-capacity action, more is required. *Id*. Only when the entity itself is a moving force behind the deprivation of a federal right will the entity be held liable under Section 1983; the entity's policies or customs must have played a part in the violation of federal law, and the only defenses to liability or immunities that can be claimed in an official-capacity action are forms of sovereign immunity possessed by the entity. *Id*. at 167.

---

[2]Ark. Code Ann. § 16-123-105(c).

Faughn and Colvin rely on cases from the Eighth Circuit Court of Appeals for the proposition that a complaint that does not specifically name the defendant in his or her individual capacity is presumed to be one against the defendant in his or her official capacity only. *See, e.g., Baker v. Chisom*, 501 F.3d 920 (8th Cir. 2007). However, the Ninth Circuit has adopted an opposite presumption that claims are made against the defendant in his or her individual capacity if the complaint is silent about the capacity in which the defendant is being sued. *See, e.g., Price v. Akaka*, 928 F.2d 824 (9th Cir. 1991). Other federal circuits approach the issue by examining the "course of proceedings." *See, e.g., Kentucky v. Graham*, *supra* (discussing holistic look at the record to make the determination of individual capacity versus official capacity).[3] We find the "course of proceedings" approach more persuasive. Generally, we require fact-based pleadings and frown upon the need for "magic words," which runs counter to appellants' position. *See, e.g.,* Ark. R. Civ. P. 8 (2019); *Atwood v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 448, 588 S.W.3d 48; *Kiswire Pine Bluff, Inc. v. Segars*, 2018 Ark. App. 296, 549 S.W.3d 410; *Duvall v. Carr-Pool*, 2016 Ark. App. 611, 509 S.W.3d 661; *Schermerhorn v. State*, 2016 Ark. App. 395, 500 S.W.3d 181. In addition, our supreme court has looked to the "complaint as a whole" to determine the true nature of the action. *See generally, Stokes v. Stokes*, 2016 Ark. 182, 49 S.W.3d 113; *Bristol-Meyers Squibb Co. v. Saline Cty. Circ. Ct.*, 329 Ark. 357, 947 S.W.3d 12.

Here, even though the Kennedys did not specify that they were suing Faughn and Colvin in their "individual capacities," the complaint was titled using their individual names

---

[3]"In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. 'The course of proceedings' in such cases typically will indicate the nature of the liability sought to be imposed.'" *Kentucky v. Graham*, 473 U.S. 159, 171 n.14 (1985).

rather than their official titles. The factual allegations in the complaint described only individual conduct by Faughn, Colvin, and John Does 1 and 2 and contains no allegations regarding unconstitutional police-department procedures, policies, or customs. The Kennedys also sought punitive damages against the defendants, which are not available in an "official-capacity" case. Presumably, Faughn and Colvin also understood the suit to be one against them in their individual capacities, as they asserted qualified immunity, which is available only in individual-capacity cases. *Hafer v. Melo*, 502 U.S. 21 (1991). Considering the entire "course of proceedings," we are convinced the trial court did not err in concluding that the Kennedys sued defendants in their individual, rather than their official, capacities.

### B. Qualified Immunity on ACRA Claims

Turning to the second portion of their first point on appeal, Faughn and Colvin contend that even if the action was correctly regarded as one against them in their individual capacities, they were still entitled to qualified immunity on the ACRA claims. Accordingly, they claim the trial court erred in denying their motion for summary judgment. We disagree in part and agree in part, but on different grounds.

Qualified immunity protects an officer from liability in an excessive-force case unless the officer's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Shekleton v. Eichenberger*, 677 F.3d 361 (8th Cir. 2012). Whether a party is immune from suit is purely a question of law and is reviewed de novo on appeal. *Harris v. Parrish*, 2018 Ark. App. 348, 552 S.W.3d 475. Whether summary judgment on grounds of immunity is appropriate on a particular set of facts is purely a question of law, but it is a legal question

5

that sits near the law-fact divide. *Id.* The general rules regarding summary judgment still apply. *Id.*

Summary judgment is appropriate only when there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* The evidence is reviewed de novo in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* In addition, even when there is no material dispute as to the facts, we must determine whether reasonable minds could draw reasonable inconsistent hypotheses to render summary judgment inappropriate. *Id.* In other words, when the facts are not disputed but possible inferences therefrom are disputed, the court will consider whether those inferences can be reasonably drawn from the undisputed facts and whether reasonable minds might differ on those hypotheses. *Id.* If so, summary judgment is not appropriate. *Id.*

Evaluating a claim of qualified immunity involves a two-step inquiry: (1) do the facts shown by the plaintiff demonstrate a violation of a constitutional or statutory right and (2) was the constitutional or statutory right identified by plaintiff clearly established at the time of the defendant's alleged misconduct? *Shekleton, supra.*[4]

1. *Do the facts demonstrate a violation of a constitutional or statutory right?*

Regarding the first step of the inquiry, as explained in *Shekleton*, the constitutional right involved in cases of this nature is the right to be free from excessive force. The right

---

[4]As mentioned previously, and as our court explained in *Harris, supra,* "Parrish's claim of excessive force against Harris was brought solely under the Arkansas Civil Rights Act, *see* Arkansas Code Annotated section 16-123-105, and subsection (c) provides that 'when construing this section, a court may look for guidance to state and federal decisions interpreting Civil Rights Act of 1871 as amended and codified in 42 U.S.C. § 1983.'" *Harris*, 2018 Ark. App. 348, at 6, 552 S.W.3d at 479.

to be free from excessive force dates to the adoption of the Bill of Rights of our Constitution, as it is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person. *Id.* To determine whether the force used is excessive, we consider whether the amount of force used was objectively reasonable under the particular circumstances. *Id.* Reasonableness must be judged from the perspective of a reasonable officer on the scene, taking into consideration the totality of the circumstances and the severity of the crime at issue, the immediate threat the suspect poses to the safety of the officer or others, and whether the suspect is actively resisting or attempting to evade arrest by flight. *Id.* Force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public. *Id.*

Viewing the evidence in the light most favorable to Wayne and Alfred and applying this two-step inquiry, we first assess whether the facts demonstrate a violation of Wayne and Alfred's constitutional right to be free from excessive force. On January 14, 2016, Wayne Kennedy was convicted of inattentive driving and fined $200 in the St. Francis County District Court. He retrieved his paperwork and headed to the clerk's office to discuss payments for the fine. His father, Alfred Kennedy, left the courtroom and went outside. Wayne did not have enough cash to make the minimum $50 payment on the fine, and the clerk told him if he left without paying, he would be arrested. (It is not clear from the record before us why the court clerk believed she had the authority to tell Wayne that he'd be arrested on the spot if $50 was not paid then and there.) Wayne saw Officers Faughn and Washington in the lobby and asked Faughn to get his father to come to the clerk's office. Wayne stated that Officer Washington then immediately entered the hallway and stood

7

behind him. Alfred came into the clerk's office and stood beside Wayne at the counter. Faughn followed Alfred in and stood behind him at the counter.

Wayne asked his dad for money to make the payment. Alfred gave Wayne a $100 bill but told Wayne to post an appeal bond instead. Officer Faughn told Alfred several times that if Wayne left without paying the fine, he would go to jail. (It is not clear from the record before us why Officer Faughn believed he had the authority to tell Wayne that he'd be arrested on the spot if $50 was not paid then and there.) After Faughn said it the third time, Alfred told Faughn that they were talking to the clerk and did not ask him anything. A verbal exchange ensued between Alfred and Faughn.

Wayne stated that Faughn stepped around and got in Alfred's face, and Wayne attempted to say, "This is not necessary." Wayne said that Faughn put his hand in Wayne's face and pushed it "like he was hitting me in the face," but Wayne leaned back, and Faughn "just pushed off my nose." Wayne stated that Officer Washington "was already in front of me and had his hand on my left chest, my left shoulder, chest area, and was pushing me back." He said he did not move in any way, shape, or form, but when Faughn stepped forward and got in his dad's face, all Wayne did was move out of his way so Faughn wouldn't run over him because "that's what was fixing to happen." He said he sidestepped just enough so he would not get hit by Faughn. Wayne said Faughn's and Washington's body language and facial expressions showed they were really aggravated. Wayne said Faughn was being aggressive because he stepped up to Alfred's face as close as he possibly could get and "swelled up, just tensed up all over." Wayne further reported that Officer Washington pushed him down the hallway.

Alfred subsequently left the courthouse, and Faughn chased after him. Alfred explained in his deposition that after he had given Wayne the money and had gone back outside, Officer Faughn ran into him from behind, grabbed him by the arm, and lost his grip and stumbled. Faughn then told Alfred to turn around and put his hands behind his back, which he did. Faughn then grabbed the back of Alfred's jacket and shoved him approximately eight feet into a brick wall while securing his right arm. A second, unknown, officer grabbed Alfred's left arm, held it behind him, and, without handcuffing him, the three began walking around the corner of the courthouse to the jail. Then Alfred was struck in the back, "hard, I mean real hard" by someone, although he did not know by whom. Faughn started pushing Alfred when they had his arms behind him.

After Alfred had been struck in the back, Officer Washington ran up, grabbed Alfred's jacket, and kicked him in the shins three times. Another officer pulled Alfred's feet out from under him. Alfred, Faughn, and another officer fell to the ground as a result. Alfred said that was when he heard, "Tase, tase, tase." He looked back, and Officer Colvin was there with the Taser in his hand. Alfred said, "Dude, you don't have to do that." Alfred said Colvin looked him in the eye and said, "Yeah, but you're going to take this five-second ride." He said Colvin pulled the trigger on the Taser, and both prongs made contact. After the tasing was over, they put handcuffs on Alfred. He said Officer Washington had his knee on his back to hold him, and when they put the handcuffs on him, they pulled one of the prongs out of his back. The other prong was still buried in his thigh. When he asked Colvin if he would pull that one out, too, Colvin said, "No, we're just going to leave that one in there."

Alfred said the officers walked him to the jail, sat him on a bench, and left him there. After thirty minutes, Officer Washington came out and took the handcuffs off him and pulled the probe out of his leg, "which he had to jerk on it three times to get it out." He said he was held in custody for approximately six and a half hours. He described his injuries as some bruises and scrapes, and "where the Taser probe was stuck in [his] thigh was actually like it was burnt." He said he had a fairly large bruise between his shoulder blades on his back and marks on his shins—they were bruised and skinned from having been kicked. He also had a scrape on his left knee where he had fallen on the ground.

A video recording of a small portion of the events was submitted as part of the summary-judgment proceedings. We have viewed it. The first part of the very short video reveals the clicking sound of a Taser in active use while Alfred is on the ground. The camera angle then changes and shows Officer Colvin holding the Taser and saying, "You gonna take that five second ride." Voices can be heard telling Alfred to put his hands behind his back. An officer then bends down to place handcuffs on Alfred, and he is lifted off the ground. Officer Colvin tells the other officers, "I only got one dart in." Alfred had no weapon on him and never threatened to use one. No officer was injured, and no officer testified that he faced a reasonable risk of being injured by Alfred. It is also worth noting that when Alfred was tased while on the ground, the video shows several officers at the scene. In fact, Alfred was arrested very near the jail itself, which is adjacent to the courthouse.

Alfred was charged with disorderly conduct and refusal to submit to arrest—both misdemeanors. He pleaded no contest to the charges, which resulted in findings of guilt on both.

According to Wayne, by the time he got his receipt and change and went outside, his dad was inside the jail. Wayne walked toward the sheriff's station at the jail and was standing at a glass-front with "a bunch of cops' faces crammed in the window yelling at me." He said he couldn't understand what they were saying because of the echo in the building, so he repeated, "What do you need? Why are you yelling at me?" He heard someone say, "You're about to be arrested if you don't tell us." He responded, "Tell you what? I don't understand. What did I even do?" Faughn said loudly and clearly, "What's his name?" and pointed toward the bench. His dad and another man were on the bench, so Wayne said, "Well, who?" He then said, "His name is the same as mine," and "they started rushing me."

Wayne said Officer Faughn grabbed him, shoved him against the wall, and attempted to grab his arm and pull it back behind him in an arm lock. He told Faughn, "I'm not resisting. I'm not going to resist" and put both of his hands behind his back. He didn't know who put the cuffs on him, but then the officers "started dragging [him] into the back." He said he was then carried into the hallway. Someone grabbed his fingers, pulled on them with enough force to dislocate them, and then shoved him into the door. He said he was then carried in and seated on the bench next to his dad for about five minutes before he and his dad were separated and put in different areas. Wayne was then charged with obstruction of governmental operations. He said he was eventually booked, strip-searched, given an outfit, and put in a cell. (Neither Alfred nor Wayne carried any weapon on his person and no physical threat was testified to by any officer. We also note that the clerk, who witnessed the entire beginning of this event, did not testify through either a deposition or an affidavit

11

as far as the record reveals.)  In any event, Wayne said he bonded out about the same time as his dad.

### 2. *Was the constitutional or statutory right clearly established at the time of the alleged misconduct?*

The second step of the qualified-immunity inquiry—whether the constitutional or statutory right was clearly established at the time of the defendant's alleged misconduct—requires the victim to point to a previously decided case or existing precedent that governs the facts and prohibits the officers from engaging in that conduct.  *See City of Escondido, California v. Emmons*,  139 S. Ct. 500 (2019).  But if an officer's cruelty is "so obvious" that he or she has "fair warning" that the conduct violated a constitutional protection, then the victim need not show the officer violated an existing precedent.  *See Hope v. Pelzer*, 536 U.S. 730 (2002).

In making this determination, we look to the state of the law at the time of the incident.  *Shekleton*, *supra*.  The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his or her conduct was unlawful in the situation the officer confronted.  *Id*.  A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful. *Id*.

In *Kisela v. Hughes*, 138 S. Ct. 1148 (2018), the Supreme Court explained that general statements of the law were not inherently incapable of giving fair and clear warning to officers, but when constitutional guidelines seem inapplicable or too remote, it is not sufficient for a court to simply state that the officer may not use unreasonable and excessive

12

force, deny qualified immunity, and then return the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the contours of that right are sufficiently definite that any reasonable official standing in the officer's shoes would understand the officer was violating that right. *Kisela, supra.* A body of relevant caselaw is usually necessary to clearly establish a violation of the right. *City of Escondido, California*, 139 S. Ct. 500.

Relevant to the facts of this case, there exists a sufficient body of caselaw establishing that tasering an individual (an older man in this case) who is already on the ground, who is not actively resisting arrest or fleeing, who has made no verbal threat to an officer's safety, is not suspected of possessing a weapon much less has brandished one, whose offense is a misdemeanor, and who poses little or no threat to the officers' or the public's security (in part because Alfred was outnumbered several officers to one, was near the jail, and was on the ground), and where such use of force was disproportionate to the need constitutes excessive force. *See, e.g.*, *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009). Citing *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009), the Eighth Circuit Court of Appeals recently stated, "[I]t was clearly established that it was unreasonable under the Fourth Amendment to apply a taser to a 'nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, [and] who posed little to no threat to anyone's safety.'" *Johnson v. McCarver*, 942 F.3d 405, 412 (8th Cir. 2019); s*ee also Franklin v. Franklin Cty., Ark.*, No. 2:17-CV-2016, 2019 WL 1757533 at ★9 (W.D. Ark. Apr. 19, 2019), *appeal filed*, No. 19–1854 (8th Cir. Apr. 25, 2019) ("It is clearly established in the Eighth Circuit that it is excessive force to use a taser on a nonfleeing, nonviolent misdemeanant."); s*ee generally Smith*

*v. Conway Cty*, 759 F.3d 853 (8th Cir. 2014); *Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993) (discussing use of tasers in context of a prison or jail setting).

### C.  Application of Qualified Immunity Analysis to ACRA Claims

#### 1.  *Wayne's claims against Colvin*

Reviewing the evidence set forth above in the light most favorable to Wayne, we are convinced that the trial court erred in denying summary judgment to Colvin on Wayne's ACRA claims.  While Wayne made excessive-force allegations against some officers, including Faughn, he did not allege that Colvin used any force against him.  There are, therefore, no material facts in dispute.

#### 2.  *Alfred's claims against Faughn and Colvin and Wayne's claims against Faughn*

We reach a different conclusion regarding Alfred's ACRA claims.  Viewing the facts most favorable to Alfred, we find that material questions of fact remain regarding whether the force Officers Faughn and Colvin used against him was reasonable.  We also find material questions of fact remain regarding the reasonableness of the use of force Faughn used against Wayne.

#### 3.  *Alfred and Wayne's claims against John Does 1 and 2*

We express no opinion regarding John Does 1 and 2 because the motion for summary judgment was filed only by Colvin and Faughn, and we do not know the current status of the pleadings with respect to the John Does.

### II.  *Tort Claims*

For their second point on appeal, Faughn and Colvin contend that the trial court erred in denying their motion for summary judgment on the Kennedys' tort claims because

the force used by the officers was reasonable, and they were therefore entitled to qualified immunity on these claims.

In interpreting the counterpart qualified-immunity statute that applies to state employees, Arkansas Code Annotated section 19-10-305 (Repl. 2016), we have traditionally been guided by the analysis adopted by the United States Supreme Court for qualified-immunity claims in federal civil-rights actions. *See, e.g.*, *Graham v. Cawthorn*, 2013 Ark. 160, 427 S.W.3d 34; *Smith v. Brt*, 363 Ark. 126, 211 S.W.3d 485 (2005). As with the ACRA claims, we conclude the trial court erred in denying summary judgment with respect to Wayne's tort claims against Colvin. While Wayne alleged facts that support tort claims against some officers, he did not specifically state such facts with respect to Colvin. We further hold there was no error in the trial court's denial of summary judgment regarding Wayne's claims against Faughn, as well as Alfred's claims against both Faughn and Colvin because material issues of fact still exist regarding the reasonableness of their conduct.

Affirmed in part and reversed and dismissed in part.

HARRISON and KLAPPENBACH, JJ., agree.

*Sara Monaghan*, for appellants.

*Easley & Houseal, PLLC*, by: *B. Michael Easley*, for appellees.