# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 17-2181

———————————————

Melanie Kelsay,

*Plaintiff - Appellee,*

v.

Matt Ernst,

*Defendant - Appellant.*

——————————

Appeal from United States District Court
for the District of Nebraska - Lincoln

——————————

Submitted: April 19, 2019
Filed: August 13, 2019

——————————

Before SMITH, Chief Judge, BEAM, LOKEN, COLLOTON, GRUENDER, BENTON, SHEPHERD, KELLY, ERICKSON, GRASZ, STRAS, and KOBES, Circuit Judges, En Banc.

——————————

COLLOTON, Circuit Judge.

Melanie Kelsay sued sheriff's deputy Matt Ernst under 42 U.S.C. § 1983, alleging that Ernst used excessive force while arresting Kelsay. The district court denied Ernst's motion for summary judgment, and Ernst appeals on the ground that

he is entitled to qualified immunity. We conclude that Ernst did not violate a clearly established right of Kelsay under the Fourth Amendment, so we reverse the order.

The question presented is whether Ernst is entitled to summary judgment, so while there are some disputes about the facts, we ultimately consider the evidence in the light most favorable to Kelsay. On May 29, 2014, Kelsay, her three children, and her friend Patrick Caslin went swimming at a public pool in Wymore, Nebraska. At one point, Caslin came up behind Kelsay like he was going to throw her in the pool, and she objected. Although Kelsay later explained that she and Caslin were "just playing around," some onlookers thought Caslin was assaulting her, and a pool employee contacted the police.

As Kelsay and her party left the pool complex, they encountered Wymore Police Chief Russell Kirkpatrick and Officer Matthew Bornmeier. Kirkpatrick informed Caslin that he was under arrest for domestic assault and escorted him to a patrol car. Kelsay was "mad" that Caslin was arrested. She tried to explain to the officers that Caslin had not assaulted her, but she thought that the officers could not hear her.

According to Kirkpatrick, Caslin became enraged once they reached the patrol car and resisted going inside. Kirkpatrick says that after he secured Caslin in handcuffs, Kelsay approached the patrol car and stood in front of the door. Kirkpatrick claims that he told her to move three times before Bornmeier escorted her away so that Kirkpatrick could place Caslin into the patrol car.

Kelsay denies approaching the patrol car until after Caslin was inside the vehicle. At that point, while Kirkpatrick interviewed witnesses, she walked over to the car to talk to Caslin. Bornmeier told her to back away from the vehicle, and Kelsay says that she complied. Two more officers—Deputy Matt Ernst and Sergeant Jay Welch from the Gage County Sheriff's Office—then arrived on the scene. When

-2-

they appeared, Kelsay was standing about fifteen feet from the patrol car where Caslin was detained, and twenty to thirty feet from the pool's exit doors. Kelsay's younger daughter was standing next to her; her older daughter and son were standing by the exit doors. Kelsay stood approximately five feet tall and weighed about 130 pounds.

Police Chief Kirkpatrick told Ernst and Welch that Kelsay had interfered with Caslin's arrest. According to Welch, Kirkpatrick explained that Kelsay tried to prevent Caslin's arrest by "trying to pull the officers off and getting in the way of the patrol vehicle door." Kirkpatrick thus decided that Kelsay should be arrested.

In the meantime, Kelsay's older daughter was near the pool exit doors yelling at a female patron who the daughter assumed had contacted the police. Kelsay started to walk toward her daughter, but Ernst ran up behind Kelsay, grabbed her arm, and told her to "get back here." Kelsay stopped walking and turned around to face Ernst, at which point Ernst let go of Kelsay's arm. R. Doc. 53-8, at 54, lines 10-12. Kelsay told Ernst that "some bitch is talking shit to my kid and I want to know what she's saying," and she continued walking away from Ernst and toward her daughter and the woman. The patron testified that she did not feel threatened at that particular moment, but later realized that Kelsay was "coming towards me to hurt me or yell at me or whatever she was planning on doing."

After Kelsay walked a few feet away from Ernst on the grass, the deputy placed Kelsay in a bear hug, threw her to the ground, and placed her in handcuffs. Kelsay momentarily lost consciousness after she hit the ground. When she regained her senses, she was already handcuffed, and she began screaming about pain in her shoulder.

Ernst drove her to the Gage County jail, but a corrections officer recommended that Kelsay be examined by a doctor. Kirkpatrick took Kelsay to a hospital, where

she was diagnosed with a fractured collarbone. Kelsay ultimately was convicted of two misdemeanor offenses after pleading no contest to attempted obstruction of government operations and disturbing the peace.

Kelsay later sued the City of Wymore and Kirkpatrick, Bornmeier, Ernst, and Welch in their individual and official capacities, alleging wrongful arrest, excessive force, and deliberate indifference to medical needs. The district court granted summary judgment in favor of all defendants on all claims but one. The court ruled that Deputy Ernst was not entitled to qualified immunity on a claim that he used excessive force to arrest Kelsay when he took her to the ground and caused the broken collarbone. The court reasoned that the evidence, viewed in the light most favorable to Kelsay, could lead a factfinder to conclude that Ernst's use of force was unreasonable and violated Kelsay's clearly established rights under the Fourth Amendment.

As an initial matter, Kelsay challenges our jurisdiction over this appeal. We have jurisdiction over an interlocutory appeal of an order denying qualified immunity if the appeal seeks review of a purely legal issue, but we ordinarily lack jurisdiction to decide "which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Unless the district court's assumed facts are blatantly contradicted by incontrovertible evidence of a sort that is not present here, we cannot entertain a contention by Ernst disputing the district court's determination about which facts Kelsay could prove at trial—for example, that Kelsay was not in a position to threaten witnesses or that she posed no danger to anyone. *See Wallace v. City of Alexander*, 843 F.3d 763, 766-67 (8th Cir. 2016). But Ernst ultimately raises the purely legal question whether the evidence viewed in the light most favorable to Kelsay shows that he violated her clearly established rights under the Fourth Amendment. We have jurisdiction to decide that question. *See Shannon v. Koehler*, 616 F.3d 855, 861 (8th Cir. 2010).

-4-

Qualified immunity shields a government official from suit under § 1983 if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A plaintiff must identify either "controlling authority" or "a robust 'consensus of cases of persuasive authority'" that "placed the statutory or constitutional question beyond debate" at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). In other words, the law at the time of the events in question must have given the officers "fair warning" that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The state of the law should not be examined at a high level of generality. "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted). "Such specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal quotation marks omitted). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (internal quotation marks omitted).

In this case, Kelsay alleged that Ernst's takedown maneuver violated her right under the Fourth Amendment to be free from the use of unreasonable force. The district court rejected Ernst's defense of qualified immunity. The court reasoned that where a nonviolent misdemeanant poses no threat to officers and is not actively resisting arrest or attempting to flee, an officer may not employ force just because the

-5-

suspect is interfering with police or behaving disrespectfully. *See Shekleton v. Eichenberger*, 677 F.3d 361, 366-67 (8th Cir. 2012); *Montoya v. City of Flandreau*, 669 F.3d 867, 871-72 (8th Cir. 2012); *Johnson v. Carroll*, 658 F.3d 819, 827 (8th Cir. 2011); *Shannon*, 616 F.3d at 864-65; *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002). The court ruled that the excessiveness of Ernst's use of force would have been apparent to a reasonable officer, because while Kelsay "was not precisely 'compliant'—that is, she had been told to stop but kept walking instead—she was not using force or actively resisting arrest, and posed no danger to anyone."

We respectfully disagree with this conclusion. It was not clearly established in May 2014 that a deputy was forbidden to use a takedown maneuver to arrest a suspect who ignored the deputy's instruction to "get back here" and continued to walk away from the officer. None of the decisions cited by the district court or Kelsay involved a suspect who ignored an officer's command and walked away, so they could not clearly establish the unreasonableness of using force under the particular circumstances here.

None of Kelsay's authorities "squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153. *Shekleton* addressed an officer's use of a taser against a compliant, nonviolent, nonfleeing misdemeanant after the officer unsuccessfully sought to handcuff the suspect and the two men accidentally fell to the ground. 677 F.3d at 366-67. *Shannon* held that an officer acted unreasonably in a pub by performing a takedown of a bar owner who was not reasonably suspected of committing any crime, did not flee or actively resist arrest, and posed little or no threat to the officer or others. 616 F.3d at 862-63 & n.3. *Brown* involved a nonviolent, nonfleeing passenger in a car who refused an officer's commands to discontinue a cell phone call with an emergency operator; the court held that shocking her with a taser for failing to get off the phone was an unreasonable use of force. 574 F.3d at 496-98. And *Montoya* held that a police officer's takedown of a suspect was

-6-

unreasonable when the nonthreatening, nonresisting, nonfleeing misdemeanant merely raised her hands above her head in frustration while standing ten to fifteen feet away from the officer. 669 F.3d at 871-72.

Decisions concerning the use of force against suspects who were compliant or engaged in passive resistance are insufficient to constitute clearly established law that governs an officer's use of force against a suspect who ignores a command and walks away. The Supreme Court recently vacated the denial of qualified immunity for an officer who executed a takedown of a man who posed no apparent danger but disobeyed the officer's command not to close an apartment door and then "tried to brush past" the officer. *City of Escondido v. Emmons*, 139 S. Ct. 500, 503-04 (2019) (per curiam). On remand, the Ninth Circuit concluded that precedent involving force employed in response to passive resistance was not sufficiently on point to constitute clearly established law that governed the takedown at the apartment door. *Emmons v. City of Escondido*, 921 F.3d 1172, 1175 (9th Cir. 2019) (per curiam). This court's precedent likewise did not clearly establish that Ernst was forbidden to perform a takedown when Kelsay walked away.

In this case, moreover, Ernst knew when he spoke to Kelsay that she was going to be arrested for attempting to interfere with Caslin's arrest. Kelsay then walked toward another patron after stating that "some bitch is talking shit to my kid and I want to know what she's saying." Even if a jury could find that Kelsay posed no danger to anyone at the time of the seizure, a reasonable officer in Ernst's position could have believed that it was important to control the situation and to prevent a confrontation between patrons that could escalate. This is another factor that was not present in previous cases, and reasonableness depends on the totality of the circumstances.

Although the principal dissent suggests that there is a factual dispute about whether Kelsay complied with Ernst's command by momentarily stopping and

turning around, the relevant question is not whether Kelsay complied as a factual matter. The issue is whether a reasonable officer could have believed that Kelsay was not compliant. Whether the officer's conclusion was reasonable, or whether he was "reasonably unreasonable" for purposes of qualified immunity, *see Anderson*, 483 U.S. at 643-44, are questions of law, not fact. They are matters for resolution by the court, not by a jury. And Ernst's conclusion that Kelsay failed to comply was objectively reasonable. A reasonable police officer could expect Kelsay to understand his command to "get back here" as an order to stop and remain, not as a directive merely to touch base before walking away again.

Our closest decision on point supports qualified immunity for Ernst. In *Ehlers v. City of Rapid City*, 846 F.3d 1002 (8th Cir. 2017), we held that an officer did *not* violate the Fourth Amendment by executing a takedown of a nonviolent misdemeanant when the officer twice ordered the suspect to place his hands behind his back, but the suspect continued walking away. *Id.* at 1011. The court concluded that a reasonable officer would interpret the subject's behavior as "noncompliant," and reasoned that he "at least appeared to be resisting" when he continued to walk away, so the officer was "entitled to use the force necessary to effect the arrest." *Id.*

Under Kelsay's version of the facts, Ernst told Kelsay only once to "get back here" before she continued to walk away, but even if there might be a constitutionally significant distinction between one command and two, no such rule was clearly established when Ernst made his arrest. Where the district court correctly acknowledged that Kelsay "had been told to stop but kept walking instead," and this court's most analogous decision in *Ehlers* held that it was reasonable to perform a takedown of a suspect who disobeyed two commands and walked away, we cannot deem this "the rare obvious case" in which "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal

quotation marks omitted). The constitutionality of Ernst's takedown was not beyond debate, and he is thus entitled to qualified immunity.

For these reasons, the order of the district court denying qualified immunity is reversed.[1]

SMITH, Chief Judge, with whom KELLY, ERICKSON, and GRASZ, Circuit Judges, join, dissenting.

I respectfully dissent. Our case law was sufficiently clear at the time Deputy Ernst forcefully arrested Kelsay to have put a reasonable officer on notice that the use of force against a non-threatening misdemeanant who was not fleeing, resisting arrest, or ignoring other commands violates that individual's right to be free from excessive force.

To satisfy the specificity requirement for law to be clearly established, the Supreme Court "ha[s] stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" *Wesby*, 138 S. Ct. at 590 (ellipsis in original) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)). The Supreme Court has made clear that it does "not require a case directly on point." *al-Kidd*, 563 U.S. at 741. "But a body of relevant case law is usually necessary to clearly establish the answer . . . ." *Emmons*, 139 S. Ct. at 504 (ellipsis in original) (quoting *Wesby*, 138 S. Ct. at 590). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S.

---

[1]Kelsay also appears to contend that Ernst violated her Fourth Amendment rights by failing to remove handcuffs despite her repeated complaints of shoulder pain. The district court did not address this claim, and Ernst does not appeal any ruling about it. Accordingly, we do not consider whether Kelsay properly presented this claim in the district court or, if so, whether it would survive a motion for summary judgment.

at 741. Thus, "[t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. The legal principle set forth in that precedent "must be settled law, which means it is dictated by controlling authority[2] or a robust consensus of cases of persuasive authority." *Id.* at 589–90 (cleaned up). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590.

## I. *Existing Precedent on Excessive Force*

"[W]hether an officer has used excessive force 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kisela*, 138 S. Ct. at 1152 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Our precedent has applied these factors to circumstances similar to Kelsay's and held that "it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown*, 574 F.3d at 499. In *Brown*, law enforcement pulled over the plaintiff's husband for allegedly driving under the influence. *Id.* at 493–94. After the husband was handcuffed, the plaintiff, who was seated in the front passenger seat, became frightened and called 911 on her cell phone. *Id.* at 494. An officer told her to hang up. *Id.* The passenger responded that she was frightened and wanted to remain on the phone with 911. *Id.* The officer ordered the plaintiff a second time to get off the phone, and the plaintiff again responded that she was frightened. *Id.* The officer then entered the car and tased the plaintiff. *Id.*

---

[2]The Supreme Court has "[a]ssum[ed] for the sake of argument that a controlling circuit precedent could constitute clearly established federal law." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (per curiam).

Ultimately, the husband was ticketed for speeding, while the plaintiff was charged with obstruction of legal process and an open bottle violation. *Id.* at 494–95.

We held that the responding officer's use of force was not objectively reasonable under the circumstances. *Id.* at 496. First, the passenger was suspected of committing a misdemeanor open bottle violation as opposed to "a severe or violent crime." *Id.* Second, the passenger "posed at most a minimal safety threat to" the officers. *Id.* at 497. At no time did the passenger "threaten the officers, verbally or physically." *Id.* Third, the passenger "was not actively resisting arrest or attempting to flee." *Id.* Instead, the passenger's "principal offense . . . was to disobey the commands to terminate her call to the 911 operator." *Id.* "Whether [the responding officer] reasonably interpreted [the passenger's] refusal as a realistic threat to his personal safety or whether it constituted nothing more than an affront to his command authority," we explained, was "a matter for a jury to decide." *Id.*

Second, in *Shannon*, an officer responded to a call for a disturbance between two females at a bar involving an injured person. 616 F.3d at 858. At the scene, the female who called 911 told the officer "that one of the females inside [the bar] had been 'touched or grabbed by the male who was in the bar.'" *Id.* (quotation omitted). Once inside the establishment, the plaintiff walked toward the officer and, "using profanity," told the officer that he owned the bar and did not need the officer. *Id*. (quotation omitted). The plaintiff ordered the officer out of the bar. *Id.* The plaintiff "eventually [came] within arm[']s length of [the officer]." *Id.* (second alteration in original) (quotation omitted). While the officer alleged that the plaintiff poked him in the chest two times, the plaintiff denied doing so. *Id.* The officer performed a takedown of the plaintiff, causing the plaintiff "to hit a bar stool and land on the hardwood floor." *Id.* (quotation omitted). The officer had to use additional force in handcuffing the plaintiff. *Id.* The plaintiff alleged he was injured during the arrest. *Id.* The plaintiff "was convicted in state court of interfering with official acts, a misdemeanor offense." *Id.* at 863 n.4.

-11-

In holding that the officer's use of force was not objectively reasonable under the circumstances based on the plaintiff's version of events, we noted that the plaintiff "was not suspected of committing a serious crime, that he did not attempt to flee or actively resist arrest, and that he posed little or no threat to [the officer] or others." *Id.* at 862. "It follow[ed], *a fortiori*, that using enough force to cause the injuries that [the plaintiff] allege[d]—a partially collapsed lung, multiple fractured ribs, a laceration to the head, and various contusions—was also unreasonable." *Id.* at 863 (citing *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003) ("In addition to the circumstances surrounding the use of force, we may also consider the result of the force.")). We next held that the plaintiff's constitutional right to be free from excessive force in such circumstances was clearly established. *Id.* at 864. "Long before [the date of the incident], this court (among others) had announced that the use of force against a suspect who was not threatening and not resisting may be unlawful." *Id.* We recognized that "[a]lthough [the plaintiff] greeted [the officer] in a disrespectful, even churlish manner, that alone did not make [the officer's] use of force acceptable under extant law." *Id.* at 865 (citing *Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983) ("'[T]he use of any force by officers simply because a suspect is argumentative, contentious, or vituperative' is not to be condoned." (alteration in original) (quoting *Agee v. Hickman*, 490 F.2d 210, 212 (8th Cir. 1974)))).

Third, *Montoya* involved two officers responding to a domestic dispute between the plaintiff and her ex-boyfriend at the ex-boyfriend's home. 669 F.3d at 869. Upon their arrival to the residence, the officers witnessed the plaintiff and her ex-boyfriend arguing outside. *Id.* Thereafter, the plaintiff, the ex-boyfriend, the plaintiff's mother, the plaintiff's friend, and the officers stood in a circle. *Id.* The ex-boyfriend stood between the two officers, while the plaintiff stood opposite of them, approximately ten to fifteen feet away. *Id.* The plaintiff and the ex-boyfriend were having words. *Id.* The officers stated that the plaintiff had taken a step forward and raised her fist, but, according to the plaintiff's account, she was merely using her hands to express herself. *Id.* One of the officers grabbed the plaintiff's left arm, put

-12-

it behind her back, and handcuffed her left wrist. *Id.* The second officer then attempted to get the plaintiff's right arm behind her and told her to stop resisting. *Id.* The first officer then performed a takedown of the plaintiff, causing her to fall to the ground face first. *Id.* The officer fell on top of the plaintiff. *Id.* The takedown fractured the plaintiff's knee. *Id.* at 870. The plaintiff was charged with simple assault or, in the alternative, disorderly conduct, as well as resisting arrest. *Id.* She was convicted only of disorderly conduct. *Id.*

We held that the officer's takedown of the plaintiff was not objectively reasonable under the circumstances. *Id.* at 871. First, the plaintiff posed no threat to the safety of the officers or others. *Id.* She "was standing ten to fifteen feet away from [the ex-boyfriend] when she raised her hands above her head in frustration. She assert[ed] she did not intend to hit [the ex-boyfriend], and [he] testified he did not feel threatened by her actions." *Id.* Second, the plaintiff "was not actively resisting arrest, and [she] was not attempting to flee." *Id.* Third, the plaintiff's "actions amounted to a violation of a law restricting disorderly conduct, a misdemeanor." *Id.* Fourth, "although not dispositive, the severity of the injuries she sustained[—a broken leg—was] a relevant factor in determining the reasonableness of the force used." *Id.* at 872. We held that the plaintiff's right to be free from excessive force under such circumstances was clearly established:

> Assuming once again [the plaintiff's] story is true, the contours of the right at issue were sufficiently clear to inform a reasonable officer in [the officer's] position it was unlawful for him to perform a 'leg sweep' and throw to the ground a nonviolent, suspected misdemeanant who was not threatening anyone, was not actively resisting arrest, and was not attempting to flee.

*Id.* at 873.

Finally, in *Shekleton*, an officer approached the plaintiff outside of a bar after allegedly witnessing the plaintiff arguing with the bartender. 677 F.3d at 363–64. The officer believed that the plaintiff was intoxicated and asked the plaintiff to move away from the street; the plaintiff complied. *Id.* The officer asked the plaintiff three times why he had been arguing with the bartender. *Id.* After the officer inquired for the third time, the plaintiff became agitated, again told the officer he had not been arguing with the bartender, and demanded an apology from the officer. *Id.* After demanding an apology, the plaintiff stopped leaning against a wall, unfolded his arms, and turned toward the officer. *Id.* The officer then twice instructed the plaintiff to put his hands behind his back. *Id.* The plaintiff replied that he was unable to do so, and the officer confirmed knowing that the plaintiff was unable to do so (the plaintiff had a condition preventing him from doing so which was well-known in the community). *Id.* at 364–65. The officer attempted to handcuff the plaintiff, but he lost his grip on the plaintiff's arm. *Id.* at 365. The two men fell to the ground. *Id.* Two other officers then exited the bar and heard the officer tell the plaintiff to stop resisting. *Id.* After attempts to restrain the plaintiff's arms failed, the officer yelled "taser, taser, taser" and discharged the taser at the plaintiff. *Id.* The electric charge into the plaintiff's chest and rib cage caused him to fall face-first to the ground; he suffered minor head injuries. *Id.* The plaintiff was handcuffed and arrested for public intoxication and interference with official acts. *Id.* But the charges against the plaintiff were subsequently dropped. *Id.*

"Viewing the facts in the light most favorable to [the plaintiff]," we concluded that the plaintiff had "established that a violation of a constitutional right occurred." *Id.* at 366. The plaintiff "was an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him." *Id.* The facts showed that the plaintiff "complied with the officer's orders to step away from the street and did not behave aggressively towards [the officer], nor did [the plaintiff] direct obscenities towards [the officer] or yell at him." *Id.* The officer was on notice that the plaintiff could not physically place

-14-

his hands behind his back when the officer asked the plaintiff to do so. *Id.* And, while the officer and the plaintiff fell away from each other during the attempted handcuffing, the plaintiff "did not resist and did not intentionally cause the two to break apart." *Id.* Based on these facts, we held that "a reasonable officer would not have deployed his taser under the circumstances as presented by [the plaintiff]." *Id.* As in *Brown*, we concluded that "the general law prohibiting excessive force in place at the time of the incident was sufficient to inform an officer that use of his taser on a nonfleeing, nonviolent suspected misdemeanant was unreasonable." *Id.* at 367 (citing *Brown*, 574 F.3d at 499–500).

## II. *Application of Existing Precedent to Present Case*

*Brown*, *Shannon*, *Montoya*, and *Shekleton* comprise our "body of relevant case law," *see Emmons*, 139 S. Ct. at 504 (quotation omitted), that made it sufficiently clear at the time of the incident to warn a reasonable officer that the use of force against a non-threatening misdemeanant who was not fleeing, resisting arrest, or ignoring other commands violates that individual's right to be free from excessive force. Viewing the facts in the light most favorable to Kelsay—which we are required to do at this stage of the litigation—she satisfies all of these criteria. First, Kelsay was a misdemeanant and not suspected of a "severe or violent crime." *See Brown*, 574 F.3d at 496. She was convicted of two misdemeanor offenses after pleading no contest to attempted obstruction of government operations and disturbing the peace. *See id.* (open bottle violation); *Shannon*, 616 F.3d at 863 n.4 (interfering with official acts); *Montoya*, 669 F.3d at 871 (disorderly conduct); *Shekleton*, 677 F.3d at 365 (interference with official acts).

Second, viewing the facts in the light most favorable to Kelsay, Kelsay was non-threatening.[3] Kelsay was a small woman standing at 5 feet tall and weighing 130 pounds and dressed in a swimsuit, who was *walking* toward her daughter both before and after her conversation with Deputy Ernst. She had no weapon and never verbally or physically threatened anyone. *See Brown*, 574 F.3d at 497. As the majority recognizes, while the female patron who was arguing with Kelsay's daughter "later realized that Kelsay was 'coming towards me to hurt me or yell at me or whatever she was planning on doing,'" she initially "testified that she did not feel threatened *at that particular moment*." *See supra* Op. at 3 (emphasis added).

Third, viewing the facts in the light most favorable to Kelsay, she was not attempting to flee, resisting arrest, or ignoring Deputy Ernst's commands. In response to Deputy Ernst grabbing Kelsay's arm and commanding her to "get back here," Kelsay "stopped, turned around, and . . . told him, someone is talking shit to my kid, I want to know what's going on." Br. in Support of Mot. for Summ. J., Ex. C, at 43, *Kelsay v. Ernst*, No. 4:15-cv-3077 (D. Neb. Feb. 2, 2017), ECF No. 53-8. At that time, Deputy Ernst "let go" of Kelsay's arm. *Id.* at 54; *see also id.* at 47. Deputy Ernst said nothing in response to Kelsay's explanation. Because Deputy Ernst "didn't say anything" to Kelsay in response, she "turned around and started walking back." *Id.* at 54. Kelsay testified that she was not resisting arrest or stopping Deputy Ernst from handcuffing her. She also testified that she did not know that Chief Kirkpatrick wanted Deputy Ernst to arrest her. Nevertheless, Deputy Ernst "ran up behind [Kelsay] and he grabbed [her] and slammed [her] to the ground." *Id.* at 51. The maneuver—"like, a bear hug"—lifted Kelsay "off the ground." *Id.* at 98, 99. Due to the ground impact, Kelsay briefly lost consciousness. Deputy Ernst's takedown maneuver broke Kelsay's collarbone.

---

[3]The majority acknowledges the district court's "assumed fac[t]" "that Kelsay was not in a position to threaten witnesses [and] that she posed no danger to anyone" is not "blatantly contradicted by inconvertible evidence." *See supra* Op. at 4.

-16-

The majority characterizes Kelsay's actions as one of "a suspect who ignores a command and walks away"; therefore, it holds that "[d]ecisions concerning the use of force against suspects who were compliant or engaged in passive resistance are insufficient to constitute clearly established law that governs an officer's use of force." *Supra* Op. at 7. But crediting Kelsay's account of the events, Kelsay complied with Deputy Ernst's command to "get back here" by stopping, turning around, and explaining what she was doing; in response, Deputy Ernst let go of Kelsay's arm and said nothing further. If there is a dispute of fact on this question, it is material and should be resolved by a jury.

The majority relies on *Ehlers* as "[o]ur closest decision on point," *supra* Op. at 7, but *Ehlers* is distinguishable. The plaintiff in *Ehlers* twice ignored the officer's command to put his hands behind his back and continued walking as he passed the officer. For this reason, we held that the plaintiff "at least appeared to be resisting." 846 F.3d at 1011 (citing *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013). By contrast, the facts construed in the light most favorable to Kelsay show that she *did* comply with Deputy Ernst's command to "get back here" by stopping, turning around, and explaining what she was doing. Deputy Ernst implicitly recognized her compliance by letting go of her arm and saying nothing in response to her explanation.

In summary, construing the facts in the light most favorable to Kelsay, a reasonable officer would have known based on our body of precedent that a full-body takedown of a small, nonviolent misdemeanant who was not attempting to flee, resisting arrest, or ignoring other commands was excessive under the circumstances.

For these reasons, I respectfully dissent.

GRASZ, Circuit Judge, dissenting.

While the physical injury suffered by Ms. Kelsay is a serious and unfortunate event, the outcome here underscores a wider legal problem.

Like the other dissenting judges, I believe any reasonable officer would have known his conduct in this case violated Ms. Kelsay's constitutional rights under existing case law. That is simply a disagreement with the majority on the application of precedent. Beyond this, however, I do take exception to the court's opinion in one important respect.

At oral argument, the absence of judicial opinions in this circuit addressing the specific facts here, including the precise take-down maneuver used on Ms. Kelsay, was used to counter the arguments of her counsel. Yet, the court now declines to address whether the maneuver used on Ms. Kelsay violated her constitutional rights. Instead, the court relies solely on the second ("clearly established") prong of qualified immunity analysis. While this is allowed by governing precedent, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), it is, in my view, inappropriate in this case as it perpetuates the very state of affairs used to defeat Ms. Kelsay's attempt to assert her constitutional rights. *See Zadeh v. Robinson*, 928 F.3d 457, 479-80 (5th Cir. 2019) (Willet, J. concurring in part, dissenting in part) ("Section 1983 meets Catch-22."). The Supreme Court indicated in *Pearson* that the option for courts to skip to the second prong of analysis would not necessarily stunt the development of constitutional law. *Pearson*, 555 U.S. at 242. The court's opinion belies that expectation, at least in the context of excessive force claims.

This situation has much broader implications than Ms. Kelsay's broken collar bone. In the context of violations of constitutional rights by state officials, application of *Pearson* in this manner imposes a judicially created exception to a federal statute that effectively prevents claimants from vindicating their constitutional

-18-

rights.  The law is never made clear enough to hold individual officials liable for constitutional violations involving excessive force as Congress authorized in 42 U.S.C. § 1983.  Importantly, while *Pearson* authorizes this analytical approach, it does not require it.

There is a better way.  We should exercise our discretion at every reasonable opportunity to address the constitutional violation prong of qualified immunity analysis, rather than defaulting to the "not clearly established" mantra, where, as here, such analysis is not an "academic exercise," *Pearson*, 555 U.S. at 237, and where it is "difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be."  *Id.* at 236 (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)).

While implementation of this approach may or may not have brought relief to Ms. Kelsay in this court, it would help ensure this sad situation is not repeated.  The protection of civil rights and the preservation of the rule of law deserves no less.

—————————————————————